DECISION.
{¶ 1} Defendant-appellant James Love appeals the trial court's denial of his motion for a new trial based on newly discovered evidence. Love argues that the state failed through the bill of particulars to identify the times for the crimes alleged. Thus, he argues that he was surprised at trial when the victim testified about dates when, he contends, he was not in the country.
 {¶ 2} Since being imprisoned, Love has worked to prove his innocence by tracking down witnesses and documentation to confirm that he was not in the United States when the alleged offenses occurred. And he has done so. The evidence of a passport application, photographs, a personally signed book, medical records, and four independent witnesses, three of whom are foreign nationals, all show that Love was not in the United States when the alleged crimes occurred. The trial court erred by denying Love's motion for new trial. We now reverse that decision and remand for a new trial.
 I. The Underlying Facts {¶ 3} In two separate cases, Love was convicted of four counts of rape,[1] with force, of a child under 13 (B-9601201) and one count of rape, with force, of a child under 13 (B-8603968). His new-trial motion concerns the four counts of rape charged under B-9601201. We confine ourselves only to the facts underlying that case.
 {¶ 4} The victim of the alleged criminal offenses was Sarah. She testified that she met Love in the fall of 1988 when he began dating her mother, a single parent. At that time, Sarah was 11. Because Sarah's mother, Barbara, was agoraphobic, Love and Barbara mostly stayed in her home. (Agoraphobia is a condition where a person experiences extreme anxiety, or even terror, when subjected to any situation that is outside his or her "safety zone." It is commonly thought of as a fear of crowded places, and for many agoraphobics, their safety zone is their home.)
 {¶ 5} According to Sarah, one evening before Christmas of 1988, Love came into her room while she was sleeping and performed cunnilingus on her. He told her not to tell anyone.
 {¶ 6} After this incident, Sarah testified, Love would, more than monthly in 1989, perform cunnilingus on her and insert his finger into her vagina. Sarah also described an incident that took place in the spring of 1989 in an Indianapolis, Indiana, hotel room, when she woke up to find that Love had pinned down her arms and put his penis inside her vagina. At other times when Love molested her, Sarah claimed, she would feign sleep. Sarah also described two incidents where Love tried to coerce her to perform fellatio on him. Sarah testified that Love's conduct embarrassed and frightened her and that sometime before the spring of 1989 he threatened to kill her if she told anyone what was happening.
 {¶ 7} In the fall of 1990, while Love was incarcerated for the rape in case number B-8603968, Sarah told Love's wife, Kathy Kidwell, of Love's alleged abuse. Neither Sarah nor Barbara approached the police about these allegations.
 {¶ 8} But in 1996 Love was released from prison after he was granted a new trial based on ineffective assistance of counsel. After his release, Love called Barbara in February 1996 to reestablish their relationship. Barbara then contacted the police and told them that Sarah had appeared frightened by Love's call. Sarah then told the police about Love's actions.
 {¶ 9} The trial court granted the state's motion to join this case with the retrial in B-8603968. The jury found Love guilty of four counts of rape in this case — three counts for cunnilingus and one count for fellatio. The 1996 indictment had also charged Love with five counts of sexual battery,[2] for his alleged performance of cunnilingus on Sarah. But the trial court granted Love's Crim.R. 29 motions for a judgment of acquittal on the sexual-battery counts because of the requirement that the offender be "a stepparent, or guardian, custodian, or person in loco parentis" of the victim. The court determined that the evidence was insufficient to prove that Love was acting "in loco parentis" for Sarah during the commission of the alleged crimes. The court also granted Love's Crim.R. 29 motions as to the sexual-battery count and one rape count alleged to have occurred in Indiana.
 {¶ 10} Under R.C. 2907.02(B), Love was sentenced to consecutive life sentences for the four counts of rape charged in B-9601201, as the jury found that Love had committed the rapes by force or threat of force on a person under 13.
 II. An Alibi Defense {¶ 11} The crux of Love's new-trial motion based on newly discovered evidence was his claim that he was out of the United States and in Mexico and Belize when the alleged criminal acts against Sarah occurred. He did not deny dating Sarah's mother. But he said that he did not meet Sarah or her mother, Barbara, until he returned from Belize in July 1989, well after the dates of the alleged criminal offenses that Sarah had described during her testimony.
 {¶ 12} Instead, Love argued that he left Cincinnati on November 17, 1988, and flew by Delta Airlines to Ixtapa, Mexico. Love claimed that he stayed in the Zihuatanejo-Ixtapa area until May 1989, receiving funds from his father through Western Union for spending money. To bolster this claim at trial, Love had presented a notice of alibi, stating that he was in Mexico between the dates of December 1, 1988, to May 17, 1989, and in Belize from June 3 to July 2, 1989. Love also noted at trial that he was incarcerated from April 1990 to September 1995.
 {¶ 13} As further evidence of his alibi, Love produced telephone bills addressed to his mother, which showed that collect calls had been made and charged to her telephone number from Zihuatanejo, Mexico, on December 1 and December 24, 1988, and on March 4, May 4, and May 30, 1989. Also, collect calls had been placed from Belize on June 4 and June 12, 1989.
 {¶ 14} Love contended that the confusion about his alibi defense occurred because the state had failed to provide specificity in the bill of particulars. Love argues that the bill of particulars only used general time periods. He illustrated this point in introducing the amended bill of particulars, which stated that "these offenses occurred beginning in either October or November 1988 * * * and occurred on numerous occasions throughout 1988, 1989, and 1990." And despite a court order granting Love's motion for more specific dates, the state had failed to provide any additional information. It was not until Sarah testified at trial that the dates of the alleged criminal acts were discovered.
 {¶ 15} Love's alibi defense for trial was not overwhelming — he had his U.S. passport and his mother's telephone records to show collect calls made from other countries — but he did not have witness testimony to corroborate his alibi. And the state argued to the jury that there had been no proof by the defense that the calls made to Love's mother's home from Mexico or Belize had actually been made by Love.
 {¶ 16} Since his incarceration, Love worked to acquire affidavits and other evidence to corroborate his whereabouts during the timeline established by Sarah's testimony. But because of his incarceration and indigency, it took years to track down the people who could support his claims.
 {¶ 17} In his motion for a new trial, Love produced the affidavits of five witnesses who attested to Love's presence in Mexico between December 1988 and May 1989 — Yvonne Zeltner-Müller, Carienne Thompson-Jordan, Lynn Freed, Angela-Erwin-Peal, and Dr. Pamela Hanson.
 III. The Witnesses {¶ 18} The first affidavit that Love received was from Yvonne Zeltner-Müller, a Swiss citizen. She was in Mexico attending class when she met Love in Zihuatanejo. Love's mother sent many letters to Zeltner-Müller in the years after his incarceration. But none of those letters reached her. It was not until Love's mother sent a registered letter that a mail carrier in Zeltner-Müller's old hometown recognized the name. Zeltner-Müller had married, changed her name, and moved to another city in Switzerland, and the record of her forwarding address had expired years earlier. The mail carrier delivered the letter to Zeltner-Müller in December 1998, and she then contacted Love's mother in January 1999.
 {¶ 19} She stated in her affidavit that she was in Mexico from January 2 to February 28, 1989, taking Spanish at the Instituto de Idiomas Britania. Zeltner-Müller stated that she met Love at La Ropa beach in Zihuatanejo during this time, and that he worked at a restaurant on the beach. She provided the court with a copy of her certificate from her class and photographs developed in April 1989 that showed Love and her on the beach in Zihuatanejo.
 {¶ 20} A second affidavit came from Carienne Thompson-Jordan, a Canadian citizen who regularly vacationed in Zihuatanejo with her then husband. While she acknowledged receiving Love's previous letters, she did not respond to them because she was in treatment for cancer.
 {¶ 21} When she finally replied to Love's requests in 1999, she stated in her affidavit that she had met Zeltner-Müller in 1989, and that she had introduced Zeltner-Müller to Love during that time. She further stated that she remembered Love leaving Zihuatanejo in May of 1989 because he had found a ride back to the United States with other travelers who had also been vacationing at Zihuatanejo.
 {¶ 22} The third affidavit came from Lynn Freed, the author of the book Home Ground, who was a resident of Johannesburg, South Africa, when Love met her in Zihuatanejo.
 {¶ 23} Love submitted the title page from Home Ground,
personally autographed for him by Lynn Freed, with the words "For Jim Love, With love and good luck for your own book. Lynn Freed, Zihuatanejo, [Mexico] December '88." In her affidavit, Freed stated that she was in Zihuatanejo from December 5 to December 8, 1988, and that the handwriting on the title page was hers.
 {¶ 24} The fourth affidavit Love received was from Angela Erwin-Peel, a woman who had known Love since she was nine. After Love's conviction and incarceration, Erwin-Peel stopped communicating with him. She changed addresses, and Love's mother had to place several calls to people with the same last name in Hurricane, West Virginia, to track down Erwin-Peel's address. After finding her, Love's mother talked to Erwin-Peel about what she remembered from the time surrounding the alleged crimes.
 {¶ 25} Erwin-Peel said in her affidavit that she had been a pen pal of Love's since 1984. When she had not heard from him in a while in December 1988, she hired a private investigator to find him. The investigator found Love in Zihuatanejo. Erwin-Peel also stated that she had written a letter to him while he was in Zihuatanejo and that he had responded. But her efforts to find those letters or phone records from the telephone company turned out to be fruitless. She was able to submit a date book that she had kept that showed that she received a call from Love from Mexico on March 12, 1989.
 {¶ 26} The fifth affidavit was submitted by Dr. Pamela Hanson, who was retired when Love made a medical-records request after his incarceration. It took months for his records to be retrieved from the archives and supplied to Love's counsel.
 {¶ 27} Dr. Hanson verified that Love had been seen in her office on November 11, 1988, and had received an injection in preparation for a trip out of the country. The medical records she submitted noted that on November 11, 1988, Love had stated that he wanted shots because he was leaving the country to go to "Old Mexico." The records also showed that on August 14 and 22, 1989, he had returned for visits concerning "nodules on his thighs [and] shaft of penis." The notes said that Love had stated that a Mexican doctor had diagnosed him with herpes simplex B — but Dr. Hanson determined that was not the case.
 {¶ 28} Finally, Love also introduced a Freedom of Information Act/Privacy Act request that he had filed with the U.S. Government. In his first two years of incarceration, Love had made countless requests of the government to find out whether documentation existed to show his presence on a Delta airlines flight arriving in Mexico on November 17, 1988, or his application to the U.S. Embassy in Mexico City, Mexico, on May 30, 1989, when he was traveling to Belize.
 {¶ 29} After many letters denying that such records existed, in 2002 the U.S. Government found Love's passport application from the U.S. Embassy in Mexico City. It took the U.S. Governmentfive years to find and then send him the records. The records showed that Love had received a passport from the U.S. Embassy in Mexico City, Mexico, on May 30, 1989. The U.S. Embassy's documentation also contained Love's birth certificate and his Ohio driver's license.
 IV. Motion for New Trial {¶ 30} The trial court denied Love's motion for a new trial based on newly discovered evidence. In doing so, the court stated that the evidence that Love had produced was merely cumulative to his alibi defense at trial. The court determined that Love's new affidavits from various individuals, photographs, and documents to show that he was out of the country during the time stated in his notice of alibi only served to bolster his alibi.
 {¶ 31} The court also stated that Love had failed to satisfy his initial burden to show that his new evidence could not have been discovered before trial, or within 120 days following trial, through the exercise of due diligence. The court noted that Love knew of the newly discovered evidence before trial, and that he had failed to identify what steps, if any, that he had taken before or during trial to obtain the evidence offered in support of the motion.
 V. Love's Arguments {¶ 32} In challenging the denial of his motion for a new trial, Love now argues (1) that the trial court committed plain error by failing to read the trial transcripts and by interpreting the facts arbitrarily in violation of his rights to procedural and substantive due process as secured by the Fifth,Sixth, and Fourteenth Amendments to the United States Constitution; (2) that the trial court abused its discretion by finding that the newly discovered evidence was merely cumulative, resulting in a violation of his substantive and procedural due process rights; (3) that the trial court abused its discretion by finding that Love was not diligent in obtaining the newly discovered evidence of his innocence; (4) that the bill of particulars and discovery prejudiced Love by providing misleading dates and times in violation of his right to a fair trial; (5) that the newly discovered evidence warranted a new trial, and that this rendered the joinder of the 1986 and 1996 cases a retroactive misjoinder; (6) that his conviction was plain error; (7) that the state committed prosecutorial misconduct by intentionally withholding the times of the alleged offenses until mid-trial, so he could not adequately present his alibi defense; (8) that the state committed prosecutorial misconduct by becoming aware of the newly discovered evidence in 1999 and failing to seek justice when there was information that cast doubt on the correctness of the conviction; and (9) that he is actually innocent.
 {¶ 33} Because the crux of Love's appeal is that the trial court abused its discretion in denying his motion for a new trial based on newly discovered evidence, we first analyze that assignment of error.
 V. Motion for New Trial Based on Newly Discovered Evidence {¶ 34} The decision to grant or deny a defendant's motion for a new trial based on newly discovered evidence is governed by Crim.R. 33. Under Crim.R. 33(A)(6), a new trial may be granted when "new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." The rule also provides that at a new-trial hearing based on newly discovered evidence, the defendant must produce "the affidavits of the witnesses by whom such evidence is expected to be given."[3]
 {¶ 35} The rule further provides, "Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one-hundred-twenty-day period."[4]
 {¶ 36} The record indicates that the trial court never issued an order finding that Love was unavoidably prevented from discovering the evidence within the 120-day period under Crim.R. 33(B). But the trial court granted Love's motion for leave to file a motion for a new trial. And the trial court then accepted, and proceeded to rule upon, Love's Crim.R. 33 motion for a new trial.
 {¶ 37} Both Crim.R. 33(A)(6) and Crim.R. 33(B) require that the newly discovered evidence could not have been discovered with due diligence. But there is a difference between the two as to the applicable standard of review. Crim.R. 33(A)(6) determinations are reviewed under an abuse-of-discretion standard. But when a motion is filed more than 120 days after judgment, the record first must be reviewed to determine whether the defendant provided clear and convincing proof that the evidence could not have been discovered with due diligence before the time limit imposed by Crim.R. 33(B) expired.
 {¶ 38} And the Ohio Supreme Court has determined, in Statev. Petro, that to warrant a new trial based on newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not have been discovered before trial even with the exercise of due diligence; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence.[5]
 {¶ 39} Thus, under Crim.R. 33(A)(6), the decision whether to grant a new trial on the ground of newly discovered evidence falls within the sound discretion of the trial court.[6] An abuse of discretion connotes an arbitrary, unreasonable, or unconscionable decision by the trial court.[7] Unreasonable means that no sound reasoning process supports the decision.[8]
 {¶ 40} But under Crim.R. 33(B), we must also review the trial court's determination that Love did not provide clear and convincing proof that the evidence could not have been discovered with due diligence within the 120-day time limit. Clear and convincing evidence is "that measure or degree of proof which is more than a mere `preponderance of evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."[9]
 {¶ 41} Here, Love argues that the trial court abused its discretion by finding that the newly discovered evidence was merely cumulative to the evidence he presented at trial. We agree.
 {¶ 42} The elements of the Petro test illustrate why the trial court abused its discretion in denying Love a new trial. But we reorder the elements to provide a more logical analysis. The elements are thus rearranged so that for a defendant to prevail on a motion for a new trial based on newly discovered evidence, it must be shown that the new evidence (1) has been discovered since the trial; (2) is material to the issues; (3) could not have been discovered before trial even with the exercise of due diligence; (4) is not merely cumulative to former evidence; (5) discloses a strong probability that it will change the result if a new trial is granted; and (6) does not merely impeach or contradict the former evidence.
 VI. Newly Discovered Evidence {¶ 43} We turn to the first element, whether the new evidence in this case was discovered after the trial. "Newly discovered evidence" is "evidence of facts in existence at the time of trial of which the party seeking a new trial was justifiably ignorant."[10] So it seems axiomatic that new evidence would have to be discovered since the close of trial. In this case, it is obvious that the affidavits of Zeltner-Müller, Thompson-Jordan, Freed, Erwin-Peal, and Dr. Hanson were all obtained years after the close of trial. It took Love years to reconnect with these witnesses, as they all had moved, married, or retired. Years passed as Love waited for these witnesses to respond to his requests for affidavits. Also, five years passed before the U.S. Government tracked down Love's passport application made on May 30, 1989, in Mexico City, Mexico.
 {¶ 44} Love could also have been considered justifiably ignorant of the evidence because the state failed to provide a bill of particulars with any specific dates of the alleged sexual assaults. Even when Love requested more specific dates, and the court granted Love's motion, the state failed to produce a better set of times for his defense. Love thus assumed that he only needed to prepare his defense for the time when he dated Sarah's mother after he returned from Belize in July 1989 and until he went to prison in 1990. He did not become aware of the December 1988 to spring 1989 time period until Sarah took the stand on the second-to-last day of trial. Therefore, we hold that the first element of the reordered Petro test was satisfied.
 VII. New Evidence was Material to Love's Conviction {¶ 45} The second element is that the new evidence must be material to the issue. For evidence to be material to the issue, it must be "significant" and "relevant."[11] And this is the core of Love's arguments — that he was not in the United States at the times alleged by Sarah at trial. Although she had not provided the state with exact times before trial, during her testimony Sarah stated that the first time that Love had performed cunnilingus on her was around Christmas of 1988. She also testified that following this initial sexual assault, Love would, more than monthly, perform cunnilingus on her and insert his fingers into her vagina. She stated that these rapes occurred throughout the spring of 1989.
 {¶ 46} Love's new evidence supported his claim that he was not in the country during these alleged sexual assaults. He provided the affidavits of four disinterested individuals who stated that Love was in Mexico from the beginning of December 1988 to May 1989.
 {¶ 47} The first part of this time was established by the South African author, Lynn Freed. Freed attested that the signed copy of her book Home Ground, personally autographed to Love, was signed by her between December 5 and 8, 1988, in Zihuatanejo, Mexico. The Swiss citizen, Zeltner-Müller, continued the alibi defense by stating in her affidavit that she saw Love every few days on La Ropa beach in Zihuatanejo, when she was studying there between January 2 and February 28, 1989. And Canadian citizen Thompson-Jordan stated in her affidavit that she remembered Love in Zihuatanejo until May 1989, when he left for the United States. These witnesses confirmed Love's claim that he was in Mexico from December 1, 1988, to May 17, 1989.
 {¶ 48} Love also presented the affidavit of Dr. Hanson, which, with her medical notes, showed that Love was leaving for "Old Mexico" in November 1988 and that he had returned by August 14, 1989. The medical notes specified that on the November 11, 1988, visit to Dr. Hanson, Love requested shots because he was leaving for Mexico. Also, the notes for the August 14 and 22, 1989, visits showed that Love requested treatment for "nodules on his thighs [and] shaft of penis" because a Mexican doctor had misdiagnosed him with herpes simplex-B.
 {¶ 49} Finally, Love presented his passport application from May 30, 1989, in Mexico City. After Love had left Mexico, he returned to the United States for a brief respite before venturing on to Belize. He needed to procure a passport to travel to Belize and applied for one at the U.S. Embassy in Mexico City. This application, which included Love's driver's license and birth certificate, was not discovered by the U.S. Government until 2002, after years of countless requests by Love. The application, coupled with the collect calls placed from Belize on June 4 and 12, 1989, to Love's mother's house, corroborated his assertion that he was in Belize from June 3 to July 2, 1989.
 {¶ 50} Love's new evidence, if believed by a jury, would have showed that he could not have committed the crimes alleged by Sarah on the dates she testified to at trial. He could not have performed cunnilingus on her around Christmas 1988 and during the months that followed when he was not in the country. It is only logical then to conclude that this new evidence was material and relevant to his conviction.
 {¶ 51} We do not make this determination lightly. We do not know whether Love performed sexual acts on Sarah. The jury evidently believed that he had, and there were two other convictions that showed that Love had a predilection for performing cunnilingus on minor children. And there were times in the fall of 1989 and before Love went to prison in 1990 when he admittedly dated Sarah's mother, Barbara. Perhaps Sarah was merely confused about the dates of the alleged crimes. But Love had good evidence that the dates she provided during her testimony could not have been dates when he committed the alleged crimes — Love was not in the United States.
 VIII. Love Exercised Due Diligence {¶ 52} The third element of our reordered Petro test is that the new evidence could not have been discovered before trial even with the exercise of due diligence. Black's Law Dictionary defines due diligence as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation."[12] Due diligence has a somewhat accordion-like definition, as where one court might find expansively that a defendant acted with due diligence, while another court might restrictively deem that the defendant had not. In this case, the trial court held that Love had failed to satisfy his initial burden to show that his new evidence could not have been discovered before trial or within 120 days following trial through the exercise of due diligence. We must respectfully disagree.
 {¶ 53} Since the day Love was incarcerated, he worked to reestablish communication with the people he had met in Zihuatanejo. But because Love was both an indigent and incarcerated, it was extraordinarily difficult for him to track down people who had seen him eight years earlier in Zihuatanejo, Mexico.
 {¶ 54} After getting his address book in prison, Love tediously worked to reestablish connections with these people — sending many letters and eventually a registered letter to each person he could remember. But Love did not receive his first response from these letters until January 1999 — two and a half years after trial. The Swiss citizen, Zeltner-Mumller, was the first to reply. She had married, changed her name, and moved to another city in Switzerland since she had last seen Love in Mexico. When Love's stepmother sent the registered letter, a Swiss postal worker who knew Zeltner-Mumller in her old city was able to track her down and deliver the letter. She then called Love's stepmother and sent an affidavit in April 1999.
 {¶ 55} A month after Zeltner-Mumller sent her affidavit, Thompson-Jordan contacted Love and sent her own affidavit. In it, Thompson-Jordan stated that she had not responded to Love's previous letters because she was in treatment for cancer and was reluctant to get involved in Love's case. But she then confirmed that she regularly vacationed in Zihuatanejo and remembered meeting Love in 1989 on the beach. Thompson-Jordan introduced Love to Zeltner-Mumller and recalled that he left Zihuatanejo in May 1989 because he had found a way back to the United States.
 {¶ 56} It was also difficult to track down Freed, the South African author. Although Love made many attempts to mail letters to her publisher, it was not realized until 2000 that Freed had moved to San Francisco. Thereafter, Freed submitted her affidavit attesting to her personal autograph from December 1988.
 {¶ 57} The medical information was also difficult to come by, as Dr. Hanson had retired. And once contact was established between Dr. Hanson and Love's attorney, it took many months for the medical records to be located — the records had been in storage for many years.
 {¶ 58} Finally, we note that Love continually hounded the U.S. Government, and in particular the U.S. Customs Service, as he searched for documentary evidence of his visits to Mexico and Belize. It was not until 2002, after five years of requests, that the government found Love's passport application from May 30, 1989, in Mexico City.
 {¶ 59} In our view, however a court defines due diligence, Love has met this burden. We hold that there was clear and convincing evidence that Love was unavoidably prevented from the discovery of the new evidence because of the lack of specificity provided in the bill of particulars and the enormity of the task surrounding his effort to track down acquaintances from Zihuatanejo eight years earlier.
 IX. The New Evidence was not Cumulative and did not Merely Impeach — There was a Strong Probability that There would be a New Result {¶ 60} The fourth element is that the new evidence is not merely cumulative to former evidence. The trial court held that Love's evidence was merely cumulative to the alibi he had provided the trial court in 1996. But we again disagree.
 {¶ 61} The trial court relied on the fact that Love had presented a notice of alibi at trial. In his notice of alibi, Love argued that he was in Mexico between the dates of December 1, 1988, and May 17, 1989, and in Belize from June 3 to July 2, 1989. Love also noted at trial that he was incarcerated from April 1990 to September 1995.
 {¶ 62} As evidence of this alibi, Love produced telephone bills addressed to his mother that indicated that collect calls were made and charged to her telephone number from Zihuatanejo, Mexico, on December 1 and December 24, 1988, and on March 4, May 4, and May 30, 1989. Also, collect calls were placed from Belize on June 4 and June 12, 1989. But the state countered and argued to the jury that there had been no proof by the defense that the calls made to Love's mother's home from Mexico or Belize had actually been made by Love.
 {¶ 63} The evidence of Love's alibi defense at trial was not compelling — these scant documents were without witness testimony, and they were simply not persuasive for the jury against the testimony of the alleged victim.
 {¶ 64} The trial court erred in deciding that Love's new evidence was merely cumulative. Evidence that shows that a person could not have possibly committed the crime cannot be merely cumulative. The evidence of a passport application, photographs, a personally signed book, medical records, and four independent witnesses, three of which were foreign nationals, all showed that Love was not in the United States when the alleged crimes occurred. Thus, we conclude that this new evidence was not merely cumulative.
 {¶ 65} The fifth element is that the newly discovered evidence discloses a strong probability that it will change the result if a new trial is granted. Since we have already established that, if believed, Love's new evidence in fact proved that he was not in the United States at the times Sarah claimed that Love had raped her, it is only logical then that a different result would have come from a new trial.
 {¶ 66} Finally, the sixth element is that the new evidence does not merely impeach or contradict the former evidence. While Love's evidence must have obviously contradicted Sarah's testimony, it did not "merely" do so. Instead, Love's new evidence provided a certainty that he did not commit the alleged crimes on the dates to which Sarah testified.
 {¶ 67} Accordingly, we sustain Love's second assignment of error concerning the first two issues raised in that assignment, reverse the trial court's denial of Love's motion for a new trial based on newly discovered evidence, and remand this case to the trial court for a new trial.
 {¶ 68} The other two issues raised in the second assignment of error are (1) that the bill of particulars was misleading and prejudiced Love, and (2) that the newly discovered evidence warranting a new trial rendered the joinder of the 1986 and 1996 cases a retroactive misjoinder. The first issue, whether the bill of particulars was misleading, is now moot, as Love will get a new trial. On the second issue, Love argues that retroactive misjoinder "arises where joinder of multiple counts was proper initially, but later developments — such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions — render the initial joinder improper."[13] The federal court responsible for the quoted material also held that "in order to be entitled to a new trial on the ground of retroactive misjoinder, a defendant `must show compelling prejudice.'"[14] In analyzing a claim of prejudicial spillover, courts consider "(1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong."[15] Here, we note that no Ohio court has recognized retroactive misjoinder and we decline to do so now. Additionally, we decided in 1997 that the trial court did not err by joining the two cases together.[16] Since the evidence of the crimes was simple and distinct, we cannot say there was a prejudicial spillover of the 1996 charged crime and the 1986 charged crime. This issue is without merit.
 {¶ 69} By way of housekeeping, we need to address Love's other assignments of error. Love's first assignment of error, that the trial court committed plain error by failing to read the trial transcripts, is overruled because no evidence exists that the trial court failed to carry out its duties. The third and sixth assignments of error, alleging that the conviction was plain error and that Love is actually innocent, are moot, as Love will receive a new trial. And the fourth and fifth assignments, alleging prosecutorial misconduct, are now moot, as Love will receive a new trial.
 {¶ 70} In conclusion, we sustain Love's second assignment of error concerning the first two issues raised in that assignment, reverse the trial court's denial of Love's motion for a new trial based on newly discovered evidence, and remand this case to the trial court for a new trial.
Judgment reversed and cause remanded.
Hildebrandt, P.J., concurs.
Judge Rupert A. Doan was a member of the panel, but died before the release of this decision.
[1] R.C. 2907.02(A)(1)(b).
[2] R.C. 2907.03(A)(5).
[3] Crim.R. 33(A)(6).
[4] Crim.R. 33(B).
[5] See State v. Petro (1947), 148 Ohio St. 505,76 N.E.2d 370, syllabus.
[6] See State v. Hawkins (1993), 66 Ohio St.3d 339, 350,612 N.E.2d 1227.
[7] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
[8] See AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161,553 N.E.2d 597; State v. Echols (1998), 128 Ohio App.3d 677, 669-670,716 N.E.2d 728.
[9] See Cincinnati Bar Assn. v. Massengale (1991),58 Ohio St.3d 121, 122, 568 N.E.2d 1222, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
[10] See Campbell v. Am. Foreign S.S. Corp. (C.A.2, 1941),116 F.2d 926, 928.
[11] Black's Law Dictionary (8 Ed.Rev. 2004) 998.
[12] Black's Law Dictionary (8 Ed.Rev. 2004) 488.
[13] See United States v. Hamilton (C.A.2, 2003),334 F.3d 170, 181.
[14] Id. at 181-182, citing United States v. Vebeliunas
(C.A.2, 1996), 76 F.3d 1283, 1293.
[15] Id. at 182.
[16] See State v. Love (June 4, 1997), 1st Dist. No. C-960499.