[Cite as *State v. Gaines*, 2011-Ohio-6719.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-110145 |
| | | TRIAL NO. B-0308628-A |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| BRYANT R. GAINES, | : | |
| Defendant-Appellee. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: December 28, 2011

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Karla M. Hall, William Gallagher,* and *Arenstein & Gallagher,* for Defendant-Appellant.

Please note: We have removed this case from the accelerated calendar.

Per Curiam.

{¶1}    Plaintiff-appellant the State of Ohio appeals from the Hamilton County Common Pleas Court's judgment granting defendant-appellee Bryant R. Gaines's Crim.R. 33 motion for a new trial.  We reverse the judgment upon our determination that the court abused its discretion in granting a new trial.

{¶2}    Gaines was convicted of murder in 2004.   He unsuccessfully challenged his conviction in an appeal to this court, see *State v. Gaines*, 1st Dist. Nos. C-040122 and C-040139, 2005-Ohio-3032, in an R.C. 2953.21 petition for postconviction relief, see *State v. Gaines* (June 14, 2006), 1st Dist. No. C-050409, appeal not accepted for review, 111 Ohio St.3d 1470, 2006-Ohio-5625, 855 N.E.2d 1259, and in a 2005 motion seeking leave to file a motion for a new trial.

{¶3}    In 2008, Gaines filed with the common pleas court a second Crim.R. 33(B) motion, seeking leave to file a motion for a new trial on the ground of newly discovered evidence.   The court effectively granted leave to file the motion, but overruled the motion on its merits.   On appeal, we held that the common pleas court properly granted leave to file a new-trial motion, but we reversed the court's judgment upon our determination that the court had abused its discretion in overruling the motion without an evidentiary hearing.  See *State v. Gaines*, 1st Dist. No. C-090097, 2010-Ohio-895, ¶32-36.   On remand, following an evidentiary hearing, the court granted a new trial.  This appeal followed.

{¶4}    The state presents on appeal a single assignment of error, contending that the common pleas court abused its discretion in granting a new trial.  We agree.

*The Trial*

{¶5} Gaines was convicted of murder in the shooting death of Clarence Eugene Bradshaw in 2003. At Gaines's trial, 16-year-old Brandon Mincy, who was Gaines's cousin and Bradshaw's half-brother, provided the only eyewitness account implicating Gaines in the murder. Mincy testified that, shortly before midnight, he and Bradshaw stood talking on the front porch of Bradshaw's residence, when he saw Gaines and two men, later identified as brothers Lonnell Dickey and Chuckie Jackson, mount the steps of the apartment building next door. Gaines entered the building, while the two other men remained on the steps. As Bradshaw walked over to talk with the men, with Mincy trailing behind him, Dickey fired two shots at Bradshaw, and Gaines emerged from the apartment building and fired a single shot. Dickey then shot the now-prone Bradshaw at close range in the head and fled with Gaines and Jackson.

{¶6} Mincy's brother and father corroborated aspects of Mincy's testimony. His brother testified that he saw Dickey shoot Bradshaw in the head and saw Gaines flee with Dickey and a third man. His father testified that when he intercepted his sons in flight from the murder scene, Mincy told him that Gaines and another man had shot Bradshaw.

{¶7} In his statement to police and in his testimony at trial, Gaines insisted that he had been on the first floor of the apartment building, in the apartment where his friend Ronald Ralls's girlfriend resided, when he heard gunshots. He looked out the apartment window and saw a man whom he did not recognize as Bradshaw, prone on the walkway leading to the building. Five to ten minutes later, he and Ralls left the building, crossed the street, and went their separate ways.

3

{¶8}   Gaines's testimony was corroborated by Ralls and his girlfriend. Another witness denied seeing Gaines in the apartment when she heard the shots. Still another witness placed Dickey and Jackson together in the apartment building's first-floor hallway, with Dickey pulling on rubber gloves and Jackson concealing under his shirt what appeared to be a gun, before Gaines even entered the building.

{¶9}   The autopsy showed that Bradshaw had sustained two gunshot wounds each to his head, his abdomen, and his upper arm.  One head wound was a contact wound.  The police recovered two .380 shell casings and one .45-caliber shell casing near the apartment building's steps.  And the coroner recovered a .45-caliber bullet from Bradshaw's abdomen.

### *The Motion*

{¶10}  In his motion, Gaines advanced a claim of actual innocence based on newly discovered evidence.  He supported his motion with affidavits made by Mincy, Dickey, and bystander Gregory M. Carter.

{¶11}  In his affidavit, Carter averred that from the street in front of the apartment building, he had hailed Bradshaw and had watched as Bradshaw continued toward the building's entrance.  According to Carter, only Dickey and Jackson were on the building's porch, one of the men fired at Bradshaw from the porch, both men then approached Bradshaw, and Jackson shot Bradshaw in the back, while Dickey shot the now-prone Bradshaw in the head.  In all, Carter asserted, the pair fired four shots from two handguns.  Dickey and Jackson then drove away. Ten minutes later, as Bradshaw still lay on the ground, Carter saw Gaines and Ralls emerge from the apartment building and head down the street.  Carter's affidavit testimony was supplemented by the affidavit of a law student working with the Ohio

Innocence Project, who averred that Carter had expressly denied telling anyone about what he had seen the night of the murder until after Gaines had been convicted.

{¶12} Dickey, in his affidavit, also exonerated Gaines. He insisted that Gaines had remained inside the apartment building, that he alone had shot Bradshaw, and that he had done so in self defense, using two different guns.

{¶13} In his affidavits, Mincy averred that his trial testimony had been "inaccurate," and that he had not seen Gaines shoot Bradshaw. He insisted that he had implicated Gaines out of anger over Gaines's failure to stop and help Bradshaw after he had been shot. Mincy stated that he had heard Bradshaw's exchange with Carter and had "witnessed [Bradshaw's] murder." Mincy further stated that, during a conversation with Dickey in 2006, while both men were confined in the same correctional institution, Dickey had confirmed that he, with a ".38 special," and Jackson, with a .45-caliber gun, had shot Bradshaw, and that Gaines had not been involved. But Dickey refused Mincy's demand that Dickey come forward about Jackson.

{¶14} In January 2009, arguments were heard on Gaines's motion by the common pleas court judge who had succeeded the judge who had presided at Gaines's trial. The court refused to hear testimony on the motion, discounted the credibility of Mincy's affidavits, and overruled the motion upon its determination that Carter's testimony would not be outcome-determinative if a new trial were granted.

{¶15} In our 2010 decision reversing the judgment overruling the motion, we held that the common pleas court had properly granted Gaines leave to file his new-trial motion, because the affidavits offered in support of the motion supported a

finding that the newly discovered evidence was not discoverable in the exercise of due diligence. See *Gaines*, supra, at ¶32; see, also, Crim.R. 33(B). We also held that a common pleas court may apply the factors set forth in *State v. Calhoun*, 86 Ohio St.3d 279, 1999-Ohio-102, 714 N.E.2d 905, to assess the credibility of affidavits submitted in support of, and thus determine the need for an evidentiary hearing on, a Crim.R. 33(A)(6) new-trial motion. But we determined that, while the common pleas court had properly declined to discount the credibility of Carter's affidavit, the court had improperly discounted the credibility of Mincy's affidavit. And we remanded the case for an evidentiary hearing because Gaines had supported his new-trial motion with evidence demonstrating substantive grounds for relief. See *Gaines*, supra, at ¶32-36.

### The Evidentiary Hearing

{¶16} In December 2010, on remand, an evidentiary hearing was conducted on the motion by the common pleas court judge who had succeeded the judge who had initially overruled the motion. Having "read every part of the [trial] testimony of all the witnesses more than once," the court heard testimony by Carter, Mincy, Dickey, and Carter's wife.

{¶17} *Gregory Carter.* Carter testified that he had lived across the street from Bradshaw, had known him for four or five years, and had considered him a friend. Carter knew Gaines through Bradshaw and had considered Gaines a friend. Carter also knew Ralls and "knew of" Dickey, but did "not really" know Jackson.

{¶18} Carter stated that, on the night in question, as he and his wife were heading from their home to their car where it was parked on the street, he had hailed Bradshaw as Bradshaw was crossing from his apartment building to the apartment

building next door. Carter crossed the street to the foot of the driveway that ran between the two buildings. But Bradshaw asked Carter to "hold up" and proceeded toward the building's porch, where two men, one short and one tall, stood. There was insufficient light for Carter to distinguish the men's facial features, but both men were, unlike Gaines, "dark complected." As Carter waited at the foot of the driveway, he saw the "fire" of a single gunshot from where the two men stood. Carter backpedaled across the street and up the driveway of the house directly across the street from the apartment building. From the driveway, he saw Bradshaw retreat and fall and saw the two men, whom he now recognized as Dickey and Jackson, step off the porch. Carter called out, "[D]on't shoot him," and then saw Jackson, with a handgun, shoot Bradshaw either once or twice in the back and Dickey, with another handgun, shoot Bradshaw twice in the head. The two men then got into a car, U-turned, and drove away. Five-to-ten minutes later, before the police arrived, Carter saw Gaines and Ralls leave the apartment building and proceed down the street on foot. Carter and his wife then retreated into their house. Carter stated that he knew Mincy and his brother, but that he had not seen them that night.

{¶19} Carter testified that, because he "didn't want to get involved," because he was concerned for his safety and the safety of his wife and two children, and because he believed that the two shots to Bradshaw's head had been fatal, he had not gone to Bradshaw's aid. And to protect his family, he did not to tell anyone what he had seen. He did not discuss the murder with his children or with his wife, other than to agree that Bradshaw's death was a "shame." He did not follow news of the investigation or of Gaines's trial. He did not volunteer to speak to the police, either at the time of the murder or later. And no one asked him what he had seen: not

Ralls, with whom he had "met eyes" as Gaines and Ralls ran past him after the shooting; and not Gaines's lawyers, who, he asserted, had gone "to everybody's house except [his]."

{¶20} Carter moved from the neighborhood the following year. He did not see Ralls "for years" after the murder. He later "heard" that, for "a couple months after the shooting," Gaines's mother had searched for him, although she did not know him or where he lived. He did not look for her.

{¶21} It was not until five years later that Carter reluctantly "stepped up." Ralls had hired Carter to help with opening a restaurant. Gaines's mother came to the restaurant and tearfully persuaded Carter to tell her what he had seen. He told her that Gaines could not have been a shooter because he had not come out of the apartment building until after Bradshaw was already on the ground. Carter promised Gaines's mother that he "would make a statement." And while he did "[n]ot really" want to, "[b]ecause [he] * * * just want[ed] this thing to be over," he agreed to testify at the hearing.

{¶22} *Lonnell Dickey.* Dickey testified that earlier on the day of shooting, he had been involved in an "altercation" with Bradshaw's relatives, and that Bradshaw had later interceded. When Dickey returned to the apartment building that night, he did not see Mincy. But he saw Bradshaw, "walk[ing] across the grass toward [him] in an aggressive manner," with a gun in his hand. Dickey drew his .45-caliber handgun and shot Bradshaw twice. Bradshaw was then shot with a .380-caliber handgun by "someone else." Dickey professed an inability to identify the second shooter, who was behind him as he walked past Bradshaw and headed for his car. But Dickey insisted that the second shooter had not been Gaines, whom Dickey

had seen enter the apartment building before the shooting had started and emerge from the building, with Ralls, while Dickey, alone, was driving away.

{¶23} *Brandon Mincy.* Consistent with his trial testimony, Mincy testified at the hearing that, as he and Bradshaw stood outside Bradshaw's apartment building, he had seen Gaines enter the apartment building next door and then Dickey and "another gentleman" mount the building's porch steps. Mincy followed Bradshaw as he approached the two men, saw Bradshaw extend his hand toward the men, and saw Dickey shoot Bradshaw twice, once in the right side and once in the front. Bradshaw staggered, called out to Mincy, fell, and was shot twice more in the head. When Bradshaw called out to him, Mincy "froze up." It was then, "[a]fter the shooting was going on," that he saw Gaines run out of the apartment building.

{¶24} Mincy conceded that, in the aftermath of the shooting, he had implicated Gaines to his father, his brother, and the police. But he insisted that, immediately before testifying at trial, he had expressed to police detectives his concerns about a "rumor" circulating that the shooters had been Dickey and "Chuckie." The detectives responded that they could not "go off nicknames," reminded Mincy that he had "started this," and played for him his taped statement.

{¶25} Then, in 2006 Mincy encountered Dickey in prison. Dickey's statement that Gaines had not been the second shooter led to discussions with his family, which led to discussions with an Ohio Innocence Project attorney, who, at Mincy's request, supplied him with a copy of Bradshaw's autopsy report. He agreed initially only to "tell the courts" what Dickey had said to him. But at Mincy's own trial, which had preceded his prison encounter with Dickey, witnesses had been demonstrably mistaken in placing his co-defendant at the scene of the crime and in

9

placing a gun in Mincy's possession. This experience, along with his review of the autopsy report, caused Mincy to now believe that he had made "a mistake" in placing a gun in Gaines's hand and in identifying Gaines, rather than "the other individual," as the second shooter.

{¶26} Mincy also stated that he had seen Carter the night of the murder, had heard him hail Bradshaw, and had heard him say "don't shoot him." "[D]ays afterwards," Mincy spoke with Carter, who "said that he had seen everything * * *, but he said that he was not going to come testify, he wanted to stay out of it." Thereafter, Mincy told no one about Carter's presence that night or their subsequent discussion, because no one had asked.

{¶27} *Michelle Carter.* Finally, Carter's wife testified at the hearing for the state and denied "witness[ing] anything." She had been in front of her house when she heard a "popping sound" and had retreated to her front porch. From those perspectives, she asserted, she could see nothing, because "a wooded area" across the street from her house had concealed the murder scene from her view.

{¶28} Carter's wife testified on direct examination that Carter had been with her when she heard the gunshots. But on cross-examination, she conceded that, a few years earlier, she had told a police detective that Carter had, at the time, been on the street by their car talking to someone. Asked then if she remained "confident as to whether [Carter] was on [their] porch or on the street when the shots happened," she replied, "I don't remember. I don't know." But she recalled that, after the shooting was over, but before the police had arrived some 15 to 20 minutes later, Carter had gone to "investigate" and had talked to "somebody that was on the street."

*The Common Pleas Court's Decision*

{¶29} To prevail on a Crim.R. 33(A)(6) motion for a new trial on the ground of newly discovered evidence, the movant must demonstrate that the evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370, syllabus.

{¶30} During arguments following the witnesses' testimony at the hearing, the state took issue with Gaines's counsel's assertion that, in our decision remanding the case for a hearing, we had "already * * * decided" that Gaines had satisfied the *Petro* requirement that the newly discovered evidence be "such as could not in the exercise of due diligence have been discovered before the trial." The assistant prosecuting attorney pointed out that our decision "was based on the affidavits [offered in support of the motion], because at that time that's all that had been submitted," and reminded the common pleas court of its duty to "start fresh here because you have more evidence, everyone was here and they did testify. What was stated in the Court of Appeal's decision does not lock you in in any way." The common pleas court "agree[d]" with the state's characterization of its role.

{¶31} But in announcing its decision, the common pleas court evinced a reasoning process at odds with that characterization: "The Court of Appeals * * * went through [each *Petro*] criterion and said that that criterion was present and that I should have an evidentiary hearing. And if the witnesses appeared * * * [and]

basically indicated what they indicated in their affidavits and what the Court of Appeals reviewed, then I felt I am required to grant a new trial based on that. Because it's not whether I believe those witnesses. It was not for purposes of finding beyond a reasonable doubt of whether or not there is new evidence."

{¶32} These remarks make plain that the common pleas court misread our decision remanding the case for an evidentiary hearing and misperceived its role in reviewing the evidence adduced at that hearing. In our decision, we held that the record supported the common pleas court's implicit grant of leave to file a new-trial motion, because the uncontroverted averments contained in the affidavits offered with the motion supported the necessary finding that Gaines had been unavoidably prevented from discovering the evidence. We also determined that the uncontroverted averments contained in the affidavits demonstrated substantive grounds for relief. But we remanded for an evidentiary hearing on the motion because, in deciding the new-trial motion on its merits, the credibility of the affiants could not be assessed in a "paper hearing[]." See *Gaines*, supra, at ¶35 (quoting *State v. Calhoun*, 86 Ohio St.3d 279, 285, 1999-Ohio-102, 714 N.E.2d 905).

{¶33} Thus, to comply with our mandate on remand, the common pleas court was required to conduct an evidentiary hearing on Gaines's new-trial motion and, in its role as the trier of the facts, assess the credibility of the witnesses presented at the hearing, weigh the evidence, and decide the motion within the framework of all the factors set forth in *Petro*. The court conducted a hearing, and the adversarial process was brought to bear on the evidence adduced there. But in deciding the motion, the court appears to have "felt" constrained by, and thus it

deferred to, what it mistakenly perceived to be this court's findings on the *Petro* factors.

{¶34} A new-trial motion is directed to the sound discretion of the trial court, and the court's decision will not be reversed on appeal in an absence of an abuse of that discretion. See *State v. Williams* (1975), 43 Ohio St.2d 88, 330 N.E.2d 891, paragraph two of the syllabus. The Ohio Supreme Court has declared that "[t]he term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144. And the court has defined an "unreasonable" decision as a decision that is not supported by "a sound reasoning process." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

{¶35} Because the common pleas court misapprehended its role in reviewing the evidence adduced at the hearing, the court's decision cannot be said to have been based on a sound reasoning process. Therefore, the court abused its discretion in granting the motion. See, e.g., *Green v. Bailey*, 1st Dist. No. C-070221, 2008-Ohio-3569, ¶15; *Grant v. Ohio Dept. of Liquor Control* (1993), 86 Ohio App.3d 76, 83, 619 N.E.2d 1165 (citing *AAAA Enterprises* to hold that a court's decision based on a flawed reasoning process is unreasonable and thus constitutes an abuse of discretion).

### No Evidence of Due Diligence

{¶36} Ordinarily, upon determining that the common pleas court had abused its discretion in granting a new trial based on an unsound reasoning process, we would remand the case to the court to decide the motion based on a sound reasoning

process. See *Grant*, supra. But even if the court had decided the motion under the appropriate legal standard, its decision granting a new trial would have constituted an abuse of discretion, because, upon the record of the proceedings at the hearing, the common pleas court could not have found that Gaines had, as required by *Petro*, exercised "due diligence" to discover, prior to his trial, Carter's evidence exonerating him.

{¶37} Crim.R. 33(A)(6) permits a new trial to be granted "when new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." We have defined such "newly discovered evidence" as "evidence of facts in existence at the time of trial of which the party seeking a new trial was justifiably ignorant." *State v. Love*, 1st Dist. Nos. C-050131 and C-050132, 2006-Ohio-6158, ¶43 (quoting *Campbell v. Am. Foreign S.S. Corp.* [C.A.2, 1941], 116 F.2d 926, 928).

{¶38} The concept of justifiable ignorance underlies the *Petro* requirement that the newly discovered evidence be "such as could not in the exercise of due diligence have been discovered before the trial." We have acknowledged that the concept of "due diligence" has been "somewhat accordion-like" in its application, "where one court might find expansively that a defendant acted with due diligence, while another court might restrictively deem that the defendant had not." Id. at ¶52. Nevertheless, we have defined "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." Id. (quoting Black's Law Dictionary [8 Ed.Rev. 2004] 488).

14

{¶39} The Sixth Amendment to the United States Constitution imposes upon criminal defense counsel a duty to investigate the defendant's case. See *Strickland v. Washington* (1984), 466 U.S. 668, 690-691, 104 S. Ct. 2052; accord *State v. Johnson* (1986), 24 Ohio St.3d 87, 89, 494 N.E.2d 1061. The duty requires counsel to investigate "the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Johnson*, 24 Ohio St.3d at 89 (quoting 1 A.B.A. Standards for Criminal Justice [1982 Supp.], No. 4-4.1). To discharge the duty, counsel must either conduct a "reasonable investigation[]" or "make a reasonable decision that makes [a] particular investigation[] unnecessary." *Strickland*, 466 U.S. at 691; accord *Johnson*, 24 Ohio St.3d at 89.

{¶40} Relevant to the question of whether Gaines had, as required by *Petro*, exercised due diligence to discover Carter's evidence before his trial, Carter testified at the hearing that, until his encounter with Gaines's mother five years after the murder, no one had asked him what he had seen that night. He stated that he had "heard" that Gaines's mother had searched for him for "a couple of months after the shooting." He did not profess to know why she was looking for him, and he was vague about why she could not find him. But her subsequent actions in pursuing him to Ralls's restaurant and persuading him to tell her what he had seen suggest that, within months of the shooting, Gaines's mother had been operating under the suspicion that Carter had witnessed the shooting.

{¶41} Ronald Ralls, Gaines's friend and companion on the night of the shooting, testified for Gaines at his trial. According to Carter, Ralls had been aware of Carter's presence that night, because they had "met eyes" as, within minutes of the

shooting, Ralls and Gaines had fled the scene. For a year following the shooting, Carter continued to live across the street from the apartment building where Ralls's girlfriend had resided. Yet Carter did not see Ralls "for years" after the shooting.

{¶42} Two people active in Gaines's defense either knew or suspected that Carter had witnessed the shooting. Nevertheless, Gaines's counsel, in investigating Gaines's case, had gone "to everybody's house except [Carter's]." Thus, the record affirmatively demonstrates that Gaines's counsel did not discharge his duty to conduct a "reasonable investigation[.]" And the record is devoid of evidence upon which the common pleas court might have concluded that counsel had made "a reasonable decision" that would have rendered "unnecessary" an investigation into what Carter knew. Accordingly, even if the common pleas court had applied the correct legal standard in deciding Gaines's new-trial motion, the evidence adduced at the hearing would not have supported a finding that Gaines's counsel had exercised due diligence to discover Carter's evidence before trial. For that reason, we hold that the common pleas court, in granting Gaines a new trial, abused its discretion.

### We Reverse

{¶43} We, therefore, reverse the court's judgment granting Gaines's new-trial motion and remand the case with instructions to the court to enter judgment overruling the motion.

Judgment reversed and cause remanded.

SUNDERMANN, P.J., CUNNINGHAM and FISCHER, JJ.

 Please note:

The court has placed of record its own entry in this case on the date of the release of this opinion.