[Cite as *State v. V.J.*, 2014-Ohio-2618.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 13AP-799 |
| v. | : | (C.P.C. No. 13CR-03-1313) |
| V.J., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 17, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

*Yeura R. Venters*, Public Defender, and *David L. Strait*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, V.J., appeals from the judgment of the Franklin County Court of Common Pleas convicting him of two counts of rape, one count of attempted rape, one count of kidnapping, one count of abduction, and one count of domestic violence, as well as all corresponding specifications. For the following reasons, we affirm in part and reverse in part the judgment of the trial court.

I. BACKGROUND

{¶ 2} Appellant's convictions pertain to an incident that occurred on January 5, 2013 at the home appellant shared with his girlfriend, F.C., and their child K.J. The following factual summary is taken from the evidence adduced at appellant's jury trial.

{¶ 3} F.C. testified that she met appellant when she was 17 years old, and their relationship proceeded beyond friendship after she turned 18. The two began living together shortly after they started dating and F.C. became pregnant; however, during her pregnancy, their relationship ended. Their child, K.J., was born on June 7, 2002, and appellant was incarcerated at that time. Appellant remained incarcerated until March 2010 and, at that time, appellant began living with F.C. and K.J.

{¶ 4} Regarding the events of January 5, 2013, F.C. testified that she, appellant, K.J., and appellant's nephew were at their apartment at approximately 7:30 or 8:00 p.m. when appellant received a telephone call from his brother, W.J. At some point in the conversation, W.J. told appellant that he had sex with F.C. According to F.C., appellant "got very angry" and began "yelling, screaming, [and] questioning." (Tr. 91.) F.C. initially denied the allegations, but eventually admitted to appellant that she and W.J. did have an affair. F.C. testified that after her admission, appellant punched her along her cheek which caused her to fall. Appellant then proceeded to kick, hit, and spit on F.C. and also called her names and screamed at her. Thereafter, appellant grabbed F.C. "by the fistfulls of hair" and dragged her down the stairs to the basement. (Tr. 93.)

{¶ 5} Once in the basement, appellant continued to kick, hit, and spit on F.C. and then proceeded to urinate on her. F.C. testified that "[h]e said he was going to pee on me like the dog that I was." (Tr. 95.) While in the basement, appellant forced F.C. to a couch and attempted anal intercourse. When the attempt failed, appellant pulled F.C. over and performed vaginal intercourse. Though repeatedly telling him to stop, F.C. testified that appellant would scream at her such things as "[s]hut up, bitch," and "[i]s this how my brother likes it?" (Tr. 99.) After ejaculating and telling F.C. that he hoped she "got pregnant," appellant went upstairs and left F.C. in a bathroom in the basement. (Tr. 100.)

{¶ 6} Utilizing appellant's cell phone that he had previously thrown on the basement floor, F.C. sent a text message to appellant's sister, asking her to call 911. After appellant returned to the basement, he instructed F.C. to go upstairs and get "cleaned up." (Tr. 104.) Appellant then forced F.C. to the bedroom. F.C. sat on the floor while appellant called various people and told them F.C. had slept with W.J. F.C. testified:

> At one point, he made me sit on the bed and talk to his cousin and admit to his cousin that I had slept with his brother, and he proceeded to hit me while on the phone, talking to his cousin. When he got off of the phone with his cousin, he grabbed my head again and started, like, fistfuls of hair on either side and banging my head against the bed, sitting right on top of me.

(Tr. 107.)

{¶ 7} F.C. also testified that, while in the bedroom, appellant forced her to perform oral sex on him. According to F.C., "[h]e told me that if I didn't, that it really didn't matter anymore, that it was pretty much over, that I was going to do this." (Tr. 109.) F.C. testified that she "told him to please stop" and "[t]hink about what you're doing." (Tr. 109.) Afterwards, appellant took some money from F.C.'s pants' pocket and left the house. F.C. testified, "I was nervous, and I was shaking. I hit the "Talk" button. It started ringing, and it was his cousin." (Tr. 110.) F.C. testified that they had a "conversation" and then she called 911. Appellant returned as F.C. was still on the line with the 911 dispatcher. F.C. testified that upon his return, appellant appeared "a lot calmer" and informed F.C. that he "couldn't let anybody see [her] look like this." (Tr. 137.) After police arrived, appellant was placed in handcuffs, and F.C. described the events, including the sexual assaults, in her statement to the officers. F.C.'s injuries were photographed, and F.C. went to the hospital where she underwent a sexual assault examination. F.C. testified that she did not see her child or nephew at any time during the incident and believes the two children remained upstairs in K.J.'s bedroom the entire time. On cross-examination, F.C. admitted that she had consensual sex with appellant within 96 hours of the alleged sexual assault, but was uncertain as to whether it was on Friday night or Saturday morning before the incident.

{¶ 8} K.J., who was 11 years old at the time of trial, testified that, on January 5, 2013, appellant had been on the telephone and then told K.J. and his cousin to go upstairs to K.J.'s room. While in his room, K.J. heard a "loud thump" and heard F.C. "screaming" and appellant "yelling." (Tr. 183.) K.J. testified that he could only make out appellant saying "[s]top lying." (Tr. 183.) According to K.J., this went on for "[a]bout a couple hours" and that it "got quiet a little bit, and then it would start again." (Tr. 184.) K.J.

testified that he left his room once to get his cousin a glass of water, but he did not see anything.  K.J. also testified that he next saw F.C. "after it all – was all said and done," and she had "a big bruise under her eye and a couple bruises on her arms."  (Tr. 186-87.)

{¶ 9}  Columbus Police Officer Robert Carter responded to a domestic violence call at approximately 2:45 a.m. on January 6, 2013.  Appellant answered the door, and F.C. appeared "shaken a little."  (Tr. 194.)  According to Officer Carter, F.C. had bruising on her left eye, right arm, and right knee.  Upon learning of the alleged sexual assaults, Officer Carter called for a detective.

{¶ 10} Columbus Police Detective David Bobbitt testified he asked F.C. whether she had any prior consensual sexual activity in the previous 96 hours because "the current standard is 96 hours on how far out that DNA can remain in the system where consensual activity is relevant."  (Tr. 219.)  According to Detective Bobbitt's report, F.C. reported the last consensual activity with appellant was on "[t]he 4th of January, Friday afternoon." (Tr. 221.)

{¶ 11} Dr. Patricia Robitaille was the physician who treated F.C. at Mount Carmel St. Ann's Emergency Department.  During the external examination of F.C., Dr. Robitaille observed that F.C. "had multiple bruises on her entire left cheek, multiple bruises on her torso and all four extremities."  (Tr. 280.)  F.C.'s vaginal and anal examinations resulted in no remarkable findings, which, according to Dr. Robitaille, can be consistent with the history of alleged sexual assaults provided by F.C.  Specifically, Dr. Robitaille testified "you can have unwanted intercourse, and you can have everything from not a scratch to the person being dead and everything in between, so, yes, you can have no apparent injury, no bruising, no lacerations, and still have had unwanted intercourse."  (Tr. 282.) Dr. Robitaille also testified that F.C. reported consensual sexual activity occurred on the afternoon of January 4, 2013.

{¶ 12} Testing of F.C.'s bra and shirt were positive for creatinine, a compound found in urine.  Seminal fluid was identified in both F.C.'s vaginal samples and pubic hair standard.  Additionally, trace amounts of seminal fluid were identified in F.C.'s anal samples and pubic hair combings.  The DNA profiles extracted from the vaginal and anal samples were consistent with F.C. and appellant.  The DNA profile taken from F.C.'s bra

was consistent with both F.C. and appellant, while the DNA profile taken from F.C.'s shirt was consistent only with appellant.

{¶ 13} When asked what things could impact the lab's ability to get positive results on the tests conducted in this case, Lindsay Main, forensic biologist at the Bureau of Criminal Identification and Investigation ("BCI"), testified "[i]f the victim has showered, changed clothes, used the restroom, those all can inhibit or deplete the foreign DNA source." (Tr. 330.)  Main also testified that the longer the time frame between an alleged sexual assault and when samples are taken can inhibit the chances of finding foreign DNA.  Sarah Smith, DNA analyst at BCI, testified that she could not opine as to how the DNA got there as the "testing does not show a time frame or how anything appears."  (Tr. 345.)

{¶ 14} After the prosecution rested, appellant testified on his own behalf.  According to appellant, he and F.C. engaged in consensual sexual relations in the afternoon prior to the incident.  Appellant testified that shortly thereafter, W.J. called and was upset with appellant because appellant told their sister that W.J. was not watching her son as he was supposed to be.  Appellant testified that he hung up on W.J. and then W.J. began texting appellant.  According to appellant, W.J. informed appellant through text messaging that he and F.C. had an affair.  Appellant explained that he told the children to go upstairs and then he and F.C. proceeded to the basement to talk.  Appellant denied grabbing F.C. or forcing her down the stairs.  Appellant testified that, after F.C. admitted to having sex with W.J., appellant struck F.C. and then urinated on her to keep himself from hitting her again.  Appellant testified:

> I pushed her.  After I struck her, I urinated on her.  I'm embarrassed.  I'm ashamed.  But I did it.  I didn't want to hit her again.  I was so hurt.  I was angry, and I didn't want to touch her.  And that's what I did.  That's no excuse, but that's what I did.

(Tr. 372.)

{¶ 15} According to appellant, after they left the basement, he called his two sisters and his cousin to tell them about the affair.  F.C. then got cleaned up, and the two began talking in the bedroom.  Appellant described himself as very calm at this time, and appellant testified that F.C. apologized for what she had done.  Appellant also testified

that he told F.C. the relationship was over and that he wanted custody of K.J. Appellant then took $15 from F.C.'s pants' pocket and left to get cigarettes. Shortly after he returned, the police arrived. Appellant denied telling F.C. to remove her clothes, denied attempting anal intercourse, denied forcing vaginal intercourse, and denied forcing F.C. to perform oral sex on him.

{¶ 16} In a multi-count indictment rendered on March 11, 2013, appellant was indicted for two counts of rape, in violation of R.C. 2907.02, one count of attempted rape, in violation of R.C. 2923.02 as it relates to R.C. 2907.02, two counts of kidnapping, in violation of R.C. 2905.01, one count of robbery, in violation of R.C. 2911.02, one count of abduction, in violation of R.C. 2905.02, and one count of domestic violence, in violation of R.C. 2919.25. Six of the indicted counts included a specification alleging appellant was a repeat violent offender ("RVO") based on his 2002 convictions for aggravated burglary and felonious assault. After deliberations, the jury returned a verdict of not guilty on one count of robbery and the lesser-included offense of theft, not guilty on one count of kidnapping, and guilty on all remaining charges. Thereafter, the trial court found appellant guilty of the RVO specifications. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 39 years with 227 days of jail-time credit.

## II. ASSIGNMENTS OF ERROR

{¶ 17} Appellant, through counsel, presents four assignments of error for our consideration:

> [I.] Appellant was denied a fair trial by the introduction of inflammatory, emotional testimony.
>
> [II.] The judgment of the trial court is against the manifest weight of the evidence.
>
> [III.] The trial court committed plain error in imposing consecutive sentences without making the necessary findings in violation of R.C. 2929.14(C)(4).
>
> [IV.] The trial court committed plain error in imposing an aggregate sentence of thirty nine years that did not satisfy the principles set forth in R.C. 2929.11(B).

{¶ 18} After his appeal was filed through counsel, appellant filed a pro se motion for leave to file a supplemental brief with additional assignments of error. This court granted appellant's request and gave appellant until January 21, 2014 to file said brief. Appellant did not file a brief by that date but, instead, filed a supplemental brief containing two assignments of error on February 13, 2014. Also on February 13, 2014, appellant filed a motion to take judicial notice of his supplemental brief. Construing appellant's motion as one seeking leave to file an untimely brief, we grant appellant's motion.

{¶ 19} For ease of discussion, we will refer to the following assigned errors as appellant's fifth and sixth assignments of error:

> [V.] The Trial Court abused its discretion allowing the D.N.A. to be entered as evidence in violation of Rules of Evidence 402 and 403(A), which violated Appellant's Fourteenth Amendment right to due process and to equal protection under the law.
>
> [VI.] Trial Court violated Appellant's Fifth Amendment Right to the Grand Jury when it amended the indictment under Rule 7(D).

## III. DISCUSSION

### A. First Assignment of Error

{¶ 20} In his first assignment of error, appellant argues he was denied a fair trial by the introduction of inflammatory and emotional testimony. Specifically, appellant challenges the following testimony elicited during F.C.'s direct examination:

> Q. Okay. Did something happen when you were pregnant with your relationship with him?
>
> A. Yes.
>
> Q. What happened?
>
> A. Found out he was cheating on me, and the relationship was pretty much dissolved and –

(Tr. 82.)

{¶ 21} Appellant's trial counsel objected, and a sidebar conference was held. During the sidebar conference, appellant's counsel argued that F.C.'s testimony was improper as it put appellant's character immediately at issue. Therefore, appellant's counsel requested a mistrial. The prosecutor countered that the evidence was being offered to explain the trajectory of the parties' relationship and to offer an explanation as to why appellant was not in F.C.'s life for eight years. The trial court sustained the objection but denied the motion for a mistrial. When trial resumed in the jury's presence, the trial court stated:

> Okay. One of my jobs is to be like the official of evidence, and
> I can either sustain an objection, which means I agree with it,
> or I can deny the objection, okay? I'm agreeing with this
> objection. You're to disregard that last question and answer.

(Tr. 89-90.)

{¶ 22} On appeal, appellant argues F.C.'s testimony that appellant was involved with another woman at the same time F.C. was pregnant with his child was irrelevant and inflammatory. According to appellant, introduction of this evidence was prohibited under Evid.R. 404(B), which provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Appellant also argues the evidence was inadmissible under Evid.R. 403(A), which states "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury."

{¶ 23} As noted, the trial court sustained the objection to the testimony and instructed the jury to disregard the question and answer. Thus, the challenged testimony was not admitted into evidence. Nonetheless, appellant contends the trial court should have granted his motion for a mistrial.

{¶ 24} A court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether the circumstances warrant the declaration of a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). We thus review a trial judge's decision for an abuse of discretion. *Columbus v.*

*Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).

{¶ 25} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988). A trial court should only declare a mistrial when "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991), *cert. denied*, 504 U.S. 960 (1992). To determine whether the defendant was deprived of a fair trial, we must determine whether "absent the improper remark[], the jury would have found the appellant guilty beyond a reasonable doubt." *Aleshire* at ¶ 42, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984).

{¶ 26} In the case before us, the trial court sustained appellant's objection to the challenged testimony and proceeded to instruct the jury to disregard the challenged testimony. The jury is presumed to have followed the trial court's instruction. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 39; *State v. Rowe*, 92 Ohio App.3d 652, 672-73 (10th Dist.1993), *jurisdictional motion overruled*, 69 Ohio St.3d 1403 (1994).

{¶ 27} Given F.C.'s isolated reference to appellant's prior affair, the trial court's act of sustaining appellant's objection to such testimony and the trial court's instruction to the jury that it disregard the question and response, we cannot conclude that the trial court abused its discretion in denying appellant's motion for a mistrial. *State v. McCree*, 8th Dist. No. 87951, 2007-Ohio-268, ¶ 40 (no error in overruling the defendant's motion for a mistrial because the witness's reference to the defendant's criminal history was an isolated reference, the trial court properly struck the testimony, and the court advised the jury to disregard it); *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 35 (court's prompt remedial actions after prejudicial testimony prevented finding that the trial court abused its discretion in denying a motion for a mistrial).

{¶ 28} Moreover, to the extent evidence of appellant's prior affair was mentioned again during trial, such evidence was provided by appellant during his direct examination. Appellant testified, "[F.C.] got me about my cheating. I said that, 'You can't keep throwing that in my face.' " (Tr. 370.) Additionally, appellant testified, "[a]nd I also went into the thing where she got on me about lying and cheating. I said, you know, you made me feel

horrible about what I did, and then you turn around, and you're doing the same thing." (Tr. 380.)

{¶ 29} Upon review, we conclude appellant's substantial rights were not adversely affected, and the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Accordingly, we overrule appellant's first assignment of error.

### B. Second Assignment of Error

{¶ 30} Appellant's second assignment of error challenges the weight of the evidence supporting his convictions. Specifically, appellant argues that F.C.'s testimony lacked the credibility necessary to sustain the convictions concerning the sexual assaults.

{¶ 31} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *State v. Strider-Williams*, 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 12.

{¶ 32} In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-

6840, ¶ 55.  *See also State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact).

{¶ 33} In arguing that his convictions for rape and attempted rape are against the manifest weight of the evidence, appellant contends his testimony denying the allegations is more credible than the testimony of F.C. in which she alleges the sexual assaults occurred.  In support of his position, appellant directs this court to five areas of F.C.'s testimony that, in his opinion, render F.C.'s credibility suspect: (1) F.C. called appellant's cousin and not her own relatives, (2) F.C. told the cousin he could come over if he wanted to be on appellant's side, (3) while F.C. reported to the 911 dispatcher that her boyfriend had been hitting her, she did not mention the sexual assault, (4) F.C. did not mention the sexual assaults until the police arrived at the house, and (5) appellant told F.C. that he would take K.J. away from her.  According to appellant, these areas of F.C.'s testimony establish that F.C. had a motive and the time to fabricate the sexual assault allegations.

{¶ 34} Although appellant argues F.C.'s motive to lie detracts from her credibility, we remain cognizant that the trier of fact has superior, first-hand perspective in judging the demeanor and credibility of witnesses.  *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 30; *DeHass* at paragraph one of the syllabus.  Additionally, F.C. testified about the issues raised by appellant, including that she called appellant's cousin in error because she was shaking and nervous after appellant briefly left the house. Additionally, when asked why she did not tell the 911 dispatcher about the alleged sexual assaults, F.C. testified, "I just wanted them to get there.  I didn't want to go through the whole story with them on the phone.  I just wanted them to get somebody there as soon as possible."  (Tr. 139.)  Additionally, testimony regarding appellant's threats to obtain custody of K.J. was presented to the jury.  Thus, the trier of fact was aware of the issues raised by appellant, and it was within the province of the trier of fact to determine F.C.'s credibility and the weight to be given to the evidence.  *Id.*

{¶ 35} Faced with the conflicting evidence provided by the testimonies of F.C. and appellant, the jury had the responsibility to determine witness credibility.  As trier of fact, the jury was free to believe or disbelieve all or any of the testimony presented.  *State v. Matthews*, 10th Dist. No. 11AP-532, 2012-Ohio-1154, ¶ 46, citing *State v. Jackson*, 10th Dist. No. 01AP-973 (Mar. 19, 2002).  The jury chose to believe F.C.'s version of events and

to reject appellant's assertion that none of the alleged sexual assaults occurred. A conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony. *State v. Anderson*, 10th Dist. No. 10AP-302, 2010-Ohio-5561. Additionally, while appellant disagrees with the jury's credibility determination, mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest-weight grounds. *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 36} Upon thorough review of the record presented before us, we conclude appellant's argument regarding the credibility of F.C. does not render her testimony not credible as a matter of law such that a reversal on manifest-weight grounds is required. Accordingly, appellant's convictions are not against the manifest weight of the evidence, and we overrule appellant's second assignment of error.

### C. Third Assignment of Error

{¶ 37} In his third assignment of error, appellant contends the trial court committed plain error in imposing consecutive sentences without making the necessary findings required by R.C. 2929.14(C)(4).

{¶ 38} We note initially that appellant did not object during sentencing; thus, he has forfeited all but plain error. *See* Crim.R. 52(B); *State v. Wilson*, 10th Dist. No. 12AP-551, 2013-Ohio-1520, ¶ 8. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection." *State v. Gullick*, 10th Dist. No. 13AP-26, 2013-Ohio-3342, ¶ 3, citing *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995).

{¶ 39} Upon review of the record, we find the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences in this case. It is established in this district that "when the record demonstrates that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, 'appellant's sentence is contrary to law and constitutes plain error.' " *State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 15, quoting *Wilson* at ¶ 18; *State v. Boynton*, 10th Dist. No. 12AP-975, 2013-Ohio-3794, ¶ 12; *see also State v. Bailey*,

10th Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 46; *State v. Hunter*, 10th Dist. No. 13AP-196, 2013-Ohio-4013, ¶ 9; *State v. Castlin*, 10th Dist. No. 13AP-331, 2013-Ohio-4889, ¶ 8-9; *State v. Phipps*, 10th Dist. No. 13AP-351, 2013-Ohio-5546, ¶ 15; *State v. Bender*, 10th Dist. No. 12AP-934, 2013-Ohio-2777, ¶ 7; *State v. Hargrove*, 10th Dist. No. 13AP-615, 2014-Ohio-1919. As such, we must remand this matter to the trial court to consider whether consecutive sentences are appropriate pursuant to R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record. *Id.* at ¶ 13; *Boynton* at ¶ 12.

{¶ 40} Accordingly, we sustain appellant's third assignment of error.

### D. Fourth Assignment of Error

{¶ 41} In his fourth assignment of error, appellant argues the trial court erred in imposing an aggregate sentence of 39 years. According to appellant, the imposed sentence violates the consistency and proportionality principles of R.C. 2929.11(B).

{¶ 42} As stated in our disposition of appellant's third assignment of error, this matter must be remanded for resentencing. As such, appellant's fourth assignment of error is rendered moot.

### E. Fifth Assignment of Error

{¶ 43} In his fifth assignment of error, appellant contends the trial court erred in admitting DNA evidence because the evidence was both irrelevant and prejudicial. Specifically, appellant asserts that, because F.C. admitted to having consensual sexual conduct within 72 hours of the alleged sexual assaults, the DNA evidence is inadmissible since "[t]here is no way to prove that the D.N.A. found [on] the victim came from the alleged sexual assault." (Supplemental Brief, 2.)

{¶ 44} To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. *See also Oakwood v. Makar*, 11 Ohio App.3d 46, 50 (8th Dist.1983). Even if the evidence is relevant, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." However, despite the mandatory terms of Evid.R. 403(A), the appropriate standard of review is the abuse of discretion standard. The Supreme Court of Ohio has interpreted Evid.R. 403(A) to mean that " '[t]he trial court has broad discretion in the

admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.' " *Maurer* at 265, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967).

{¶ 45} In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect. *Id.* at paragraph seven of the syllabus. In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great. *State v. Morales*, 32 Ohio St.3d 252, 258 (1987). Furthermore, relevant evidence which is challenged as having probative value that is substantially outweighed by its prejudicial effects "should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect" to the party opposing its admission. *Maurer* at 265.

{¶ 46} Although evidence may be damaging or harmful to the defendant, that does not necessarily mean that the evidence is prejudicial under the rules of evidence. Only when the evidence induces the jury to decide the case on an improper basis, i.e., an emotional one, does the defendant suffer material prejudice. *State v. Bernatowicz*, 62 Ohio App.3d 132, 138 (6th Dist.1989). Further, the issue of whether testimony or evidence is relevant or irrelevant, prejudicial, confusing or misleading is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury. *Renfro v. Black*, 52 Ohio St.3d 27, 31 (1990). Thus, this court must affirm the trial court's ruling absent a showing that the trial court acted unreasonably, arbitrarily or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 47} In the case sub judice, appellant asked the trial court to find the seminal fluid and DNA evidence inadmissible as irrelevant and prejudicial. However, as the trial court explained, "it's a matter of truth and veracity whether the act occurred. The semen would be there anyway from the previous act. * * * So, you know, I don't see where you're prejudiced in any way, okay? I'll overrule that." (Tr. 42.)

{¶ 48} We cannot say the presence of appellant's seminal fluid observed in the testing of F.C.'s vaginal and anal samples is irrelevant as is it consistent with F.C.'s testimony that appellant attempted anal intercourse and successfully performed vaginal intercourse with ejaculation. While the seminal fluid could have been the result of

consensual sexual conduct with appellant that occurred either the morning of or day prior to the alleged sexual assaults, there was testimony to this effect, and we fail to perceive an abuse of discretion or any prejudice resulting from admission of the DNA evidence.

{¶ 49} Appellant's argument is more aptly categorized as a challenge to the weight of the evidence rather than to evidence admissibility. *See State v. Pierce*, 64 Ohio St.3d 490 (1992) (questions regarding reliability of DNA evidence in a given case go to the weight of the evidence rather than to its admissibility); *State v. Breeze*, 10th Dist. No. 92AP-258 (Nov. 24, 1992) (argument that DNA evidence being used to exclude sources of blood rather than to include them went to the weight of the evidence, not to its admissibility based on relevance). There was testimony from Detective Bobbitt, Main, and Smith indicating that, though appellant's seminal fluid and DNA were observed in the vaginal and anal samples of F.C., the tests could not determine how or when the DNA came to be there or whether it was the result of consensual sexual conduct or a forced sexual assault as alleged by F.C. Whether or not the alleged sexual assaults occurred throughout the evening hours of January 5, 2013 was one of the issues the jury was tasked with determining. While appellant denied any sexual conduct during this time, F.C. described three instances of unwanted sexual conduct. As discussed in our disposition of appellant's second assignment of error, a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony. *Anderson.*

{¶ 50} Upon review, we find no error in the admission of the DNA evidence, and we overrule appellant's fifth assignment of error.

### F.  Sixth Assignment of Error

{¶ 51} In his sixth assignment of error, appellant contends the trial court erred when it granted the prosecution's request to amend the indictment to remove the RVO specification from Count 7 charging abduction and Count 8 charging domestic violence.

{¶ 52} The transcript indicates that, prior to trial, the prosecutor noted the indictment contained a typographical error as it mistakenly included the RVO specification language on the charges for abduction and domestic violence. Therefore, the prosecutor asked that such language be deleted. Appellant's counsel indicated there was no objection to the deletion of the specifications from Counts 7 and 8. At the beginning of the sentencing hearing, appellant's counsel stated that appellant believed the amendment

to the indictment was improper because the amendment changed the name and identity of the offenses charged. The trial court rejected appellant's argument and proceeded to sentencing.

{¶ 53} Pursuant to Crim.R. 7(D), a court may, before, during or after a trial, amend an indictment due to any variance with the evidence, provided no change is made in the name or identity of the crime charged. A trial court's decision to permit the amendment of an indictment is reviewed under an abuse-of-discretion standard. *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 10. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore* at 219. Furthermore, when the name or identity of the crime charged is not changed by the amendment, a defendant on appeal must show that the amendment prejudiced his defense for there to be reversible error. *Smith* at ¶ 10.

{¶ 54} In appellant's case, the indictment was amended to delete the RVO specification language from Counts 7 and 8 of the indictment. Count 7 charged appellant with abduction as a third-degree felony, and Count 8 charged appellant with domestic violence as a first-degree misdemeanor. Though appellant argues to the contrary, neither the name nor identity of the crimes charged, i.e., third-degree felony abduction and first-degree misdemeanor domestic violence, were changed as a result of deleting the RVO specification language.

{¶ 55} Because the name and identity of the crimes charged were not changed by the amendment, in accordance with *Smith*, appellant must show that the amendment prejudiced his defense. This appellant has failed to do. Removal of the RVO specifications from Counts 7 and 8 actually benefited appellant. Moreover, because the RVO specification remained as to other counts in the indictment, appellant has not argued the amendment in any way prejudiced his ability to defend the charges against him. Finally, to the extent appellant asserts in this assigned error that the amendment interfered with the "Grand Jury's intent when it handed down the R.V.O[.] specification on count 7," we find no merit to said assertion. (Supplemental Brief, 4.)

{¶ 56} Accordingly, we overrule appellant's sixth assignment of error.

## IV.  CONCLUSION

{¶ 57}  In conclusion, appellant's motion is granted, appellant's first, second, fifth, and sixth assignment of errors are overruled, appellant's third assignment of error is sustained, and appellant's fourth assignment of error is rendered moot.  Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for resentencing in accordance with law and this decision.

*Motion granted;*
*judgment affirmed in part, reversed in part;*
*cause remanded.*

BROWN and CONNOR, JJ., concur.

_____