[Cite as *State v. V.J.*, 2024-Ohio-1668.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 23AP-520 |
| v. | : | (C.P.C. No. 13CR- 1313) |
| [V.J.], | : | (ACCELERATED CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 30, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson* for appellee.

**On brief:** *V.J.*, pro se.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1}  Defendant-appellant, V.J., pro se, appeals from an August 8, 2023 decision and entry denying his motion for leave to file a motion for a new trial.  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  This matter concerns an incident that took place on January 5, 2013 at the home appellant had shared with the victim in this case, F.C., and their child, K.J.

{¶ 3}  We adopt the following recitation of facts from our June 17, 2014 decision in *State v. V.J.*, 10th Dist. No. 13AP-799, 2014-Ohio-2618 ("*V.J. I*") resolving appellant's first direct appeal.

> F.C. testified that she met appellant when she was 17 years old, and their relationship proceeded beyond friendship after she turned 18. The two began living together shortly after they started dating and F.C. became pregnant; however, during her pregnancy, their relationship ended. Their child, K.J., was born on June 7, 2002, and appellant was incarcerated at that time.

Appellant remained incarcerated until March 2010 and, at that time, appellant began living with F.C. and K.J.

Regarding the events of January 5, 2013, F.C. testified that she, appellant, K.J., and appellant's nephew were at their apartment at approximately 7:30 or 8:00 p.m. when appellant received a telephone call from his brother, W.J. At some point in the conversation, W.J. told appellant that he had sex with F.C. According to F.C., appellant "got very angry" and began "yelling, screaming, [and] questioning." (Tr. 91.) F.C. initially denied the allegations, but eventually admitted to appellant that she and W.J. did have an affair. F.C. testified that after her admission, appellant punched her along her cheek which caused her to fall. Appellant then proceeded to kick, hit, and spit on F.C. and also called her names and screamed at her. Thereafter, appellant grabbed F.C. "by the fistfulls of hair" and dragged her down the stairs to the basement. (Tr. 93.)

Once in the basement, appellant continued to kick, hit, and spit on F.C. and then proceeded to urinate on her. F.C. testified that "[h]e said he was going to pee on me like the dog that I was." (Tr. 95.) While in the basement, appellant forced F.C. to a couch and attempted anal intercourse. When the attempt failed, appellant pulled F.C. over and performed vaginal intercourse. Though repeatedly telling him to stop, F.C. testified that appellant would scream at her such things as "[s]hut up, bitch," and "[i]s this how my brother likes it?" (Tr. 99.) After ejaculating and telling F.C. that he hoped she "got pregnant," appellant went upstairs and left F.C. in a bathroom in the basement. (Tr. 100.)

Utilizing appellant's cell phone that he had previously thrown on the basement floor, F.C. sent a text message to appellant's sister, asking her to call 911. After appellant returned to the basement, he instructed F.C. to go upstairs and get "cleaned up." (Tr. 104.) Appellant then forced F.C. to the bedroom. F.C. sat on the floor while appellant called various people and told them F.C. had slept with W.J. F.C. testified:

At one point, he made me sit on the bed and talk to his cousin and admit to his cousin that I had slept with his brother, and he proceeded to hit me while on the phone, talking to his cousin. When he got off of the phone with his cousin, he grabbed my head again and started, like, fistfuls of hair on either side and banging my head against the bed, sitting right on top of me. (Tr. 107.)

F.C. also testified that, while in the bedroom, appellant forced her to perform oral sex on him. According to F.C., "[h]e told me that if I didn't, that it really didn't matter anymore, that it was pretty much over, that I was going to do this." (Tr. 109.) F.C. testified that she "told him to please stop" and "[t]hink about what you're doing." (Tr. 109.) Afterwards, appellant took some money from F.C.'s pants' pocket and left the house. F.C. testified, "I was nervous, and

I was shaking. I hit the "Talk" button. It started ringing, and it was his cousin." (Tr. 110.) F.C. testified that they had a "conversation" and then she called 911. Appellant returned as F.C. was still on the line with the 911 dispatcher. F.C. testified that upon his return, appellant appeared "a lot calmer" and informed F.C. that he "couldn't let anybody see [her] look like this." (Tr. 137.) After police arrived, appellant was placed in handcuffs, and F.C. described the events, including the sexual assaults, in her statement to the officers. F.C.'s injuries were photographed, and F.C. went to the hospital where she underwent a sexual assault examination. F.C. testified that she did not see her child or nephew at any time during the incident and believes the two children remained upstairs in K.J.'s bedroom the entire time. On cross-examination, F.C. admitted that she had consensual sex with appellant within 96 hours of the alleged sexual assault, but was uncertain as to whether it was on Friday night or Saturday morning before the incident.

K.J., who was 11 years old at the time of trial, testified that, on January 5, 2013, appellant had been on the telephone and then told K.J. and his cousin to go upstairs to K.J.'s room. While in his room, K.J. heard a "loud thump" and heard F.C. "screaming" and appellant "yelling." (Tr. 183.) K.J. testified that he could only make out appellant saying "[s]top lying." (Tr. 183.) According to K.J., this went on for "[a]bout a couple hours" and that it "got quiet a little bit, and then it would start again." (Tr. 184.) K.J. testified that he left his room once to get his cousin a glass of water, but he did not see anything. K.J. also testified that he next saw F.C. "after it all—was all said and done," and she had "a big bruise under her eye and a couple bruises on her arms." (Tr. 186-87.)

Columbus Police Officer Robert Carter responded to a domestic violence call at approximately 2:45 a.m. on January 6, 2013. Appellant answered the door, and F.C. appeared "shaken a little." (Tr. 194.) According to Officer Carter, F.C. had bruising on her left eye, right arm, and right knee. Upon learning of the alleged sexual assaults, Officer Carter called for a detective.

Columbus Police Detective David Bobbitt testified he asked F.C. whether she had any prior consensual sexual activity in the previous 96 hours because "the current standard is 96 hours on how far out that DNA can remain in the system where consensual activity is relevant." (Tr. 219.) According to Detective Bobbitt's report, F.C. reported the last consensual activity with appellant was on "[t]he 4th of January, Friday afternoon." (Tr. 221.)

Dr. Patricia Robitaille was the physician who treated F.C. at Mount Carmel St. Ann's Emergency Department. During the external examination of F.C., Dr. Robitaille observed that F.C. "had multiple bruises on her entire left cheek, multiple bruises on her torso and all four extremities." (Tr. 280.) F.C.'s vaginal and anal examinations resulted in no remarkable findings, which, according to Dr. Robitaille, can be consistent with the history of alleged sexual assaults provided by F.C. Specifically, Dr. Robitaille testified "you can

have unwanted intercourse, and you can have everything from not a scratch to the person being dead and everything in between, so, yes, you can have no apparent injury, no bruising, no lacerations, and still have had unwanted intercourse." (Tr. 282.) Dr. Robitaille also testified that F.C. reported consensual sexual activity occurred on the afternoon of January 4, 2013.

Testing of F.C.'s bra and shirt were positive for creatinine, a compound found in urine. Seminal fluid was identified in both F.C.'s vaginal samples and pubic hair standard. Additionally, trace amounts of seminal fluid were identified in F.C.'s anal samples and pubic hair combings. The DNA profiles extracted from the vaginal and anal samples were consistent with F.C. and appellant. The DNA profile taken from F.C.'s bra was consistent with both F.C. and appellant, while the DNA profile taken from F.C.'s shirt was consistent only with appellant.

When asked what things could impact the lab's ability to get positive results on the tests conducted in this case, Lindsay Main, forensic biologist at the Bureau of Criminal Identification and Investigation ("BCI"), testified "[i]f the victim has showered, changed clothes, used the restroom, those all can inhibit or deplete the foreign DNA source." (Tr. 330.) Main also testified that the longer the time frame between an alleged sexual assault and when samples are taken can inhibit the chances of finding foreign DNA. Sarah Smith, DNA analyst at BCI, testified that she could not opine as to how the DNA got there as the "testing does not show a time frame or how anything appears." (Tr. 345.)

After the prosecution rested, appellant testified on his own behalf. According to appellant, he and F.C. engaged in consensual sexual relations in the afternoon prior to the incident. Appellant testified that shortly thereafter, W.J. called and was upset with appellant because appellant told their sister that W.J. was not watching her son as he was supposed to be. Appellant testified that he hung up on W.J. and then W.J. began texting appellant. According to appellant, W.J. informed appellant through text messaging that he and F.C. had an affair. Appellant explained that he told the children to go upstairs and then he and F.C. proceeded to the basement to talk. Appellant denied grabbing F.C. or forcing her down the stairs. Appellant testified that, after F.C. admitted to having sex with W.J., appellant struck F.C. and then urinated on her to keep himself from hitting her again. Appellant testified:

I pushed her. After I struck her, I urinated on her. I'm embarrassed. I'm ashamed. But I did it. I didn't want to hit her again. I was so hurt. I was angry, and I didn't want to touch her. And that's what I did. That's no excuse, but that's what I did. (Tr. 372.)

According to appellant, after they left the basement, he called his two sisters and his cousin to tell them about the affair. F.C. then got cleaned up, and the two began talking in the bedroom. Appellant described himself as very calm

at this time, and appellant testified that F.C. apologized for what she had done. Appellant also testified that he told F.C. the relationship was over and that he wanted custody of K.J. Appellant then took $15 from F.C.'s pants' pocket and left to get cigarettes. Shortly after he returned, the police arrived. Appellant denied telling F.C. to remove her clothes, denied attempting anal intercourse, denied forcing vaginal intercourse, and denied forcing F.C. to perform oral sex on him.

In a multi-count indictment rendered on March 11, 2013, appellant was indicted for two counts of rape, in violation of R.C. 2907.02, one count of attempted rape, in violation of R.C. 2923.02 as it relates to R.C. 2907.02, two counts of kidnapping, in violation of R.C. 2905.01, one count of robbery, in violation of R.C. 2911.02, one count of abduction, in violation of R.C. 2905.02, and one count of domestic violence, in violation of R.C. 2919.25. Six of the indicted counts included a specification alleging appellant was a repeat violent offender ("RVO") based on his 2002 convictions for aggravated burglary and felonious assault. After deliberations, the jury returned a verdict of not guilty on one count of robbery and the lesser-included offense of theft, not guilty on one count of kidnapping, and guilty on all remaining charges. Thereafter, the trial court found appellant guilty of the RVO specifications. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 39 years with 227 days of jail-time credit.

*V.J. I* ¶ 3-16.

{¶ 4} On appeal, appellant asserted six assignments of error. Specifically, appellant challenged the admissibility of evidence, the weight of the evidence in support of his convictions, the amendment of the indictment, and the sentences imposed by the trial court. On June 17, 2014, we issued our decision in *V.J. I* affirming in part and reversing in part. We first concluded that the trial court did not abuse its discretion when it denied appellant's motion for a mistrial based on the introduction of emotional testimony or through the admission of DNA evidence. *Id.* at ¶ 29, 50. We next found the trial court did not err by granting the state's motion to amend the indictment to remove language concerning the RVO specifications in the abduction and domestic violence charges. *Id.* at ¶ 55. We also concluded that defendant's convictions were not against the manifest weight of the evidence. *Id.* at ¶ 36. However, we found that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences and, therefore, remanded the case back to the trial court for resentencing. *Id.* at ¶ 39. Appellant filed an application for reconsideration, pursuant to App.R. 26 requesting the court reconsider its decision in *V.J. I*. We denied appellant's application on July 22, 2014. On

October 8, 2014, the Supreme Court of Ohio declined to accept jurisdiction of the appeal. *State v. V.J.*, 140 Ohio St.3d 1454, 2014-Ohio-4414. Upon remand, the trial court stated that it "weighed the factors as set forth in applicable provisions of R.C. 2929.13 and R.C. 2929.14" and resentenced appellant to 39 years of incarceration. (Jan. 9, 2015 Corrected/Am. Resentencing Entry.)

{¶ 5} On May 24, 2023, appellant filed a motion for leave to file a motion for a new trial under Crim.R. 33(A)(6). Appellant argued that he was unavoidably prevented from the discovery of his cousin's testimony within the 120 days allotted to file a motion for a new trial under Crim.R. 33. After a brief extension of time, the state filed a memorandum in opposition on June 13, 2023.

{¶ 6} On August 8, 2023, the trial court denied appellant's motion. The trial court first found that appellant had not met his burden, by clear and convincing evidence, that he was unavoidably prevented from discovering his cousin's statement prior to the expiration of the 120-day time frame set forth in Crim.R. 33(B). The trial court argued in the alternative that, even if appellant had submitted clear and convincing evidence of unavoidable prevention of discovery, the newly discovered evidence did not demonstrate that there was a strong probability that it would change the result if a new trial was granted.

{¶ 7} Appellant filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 8} Appellant assigns the following as trial court error:

> The trial court abused it's (sic) discretion by denying movant's motion for leave to file a motion for new trial.

## III. STANDARD OF REVIEW

{¶ 9} Under Crim.R. 33(A)(6), a trial court may grant a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." Generally, " ' "[n]ewly discovered evidence" is "evidence of facts in existence at the time of trial of which the party seeking a new trial was justifiably ignorant." ' " *State v. Hill*, 10th Dist. No. 22AP-576, 2023-Ohio-1954, ¶ 17, quoting *State v. Holzapfel*, 10th Dist. No. 10AP-17, 2010-Ohio-2856, ¶ 20, quoting *State v. Love*, 1st Dist. No. C-050131, 2006-Ohio-6158, ¶ 43, citing *Campbell v. Am. Foreign S.S. Corp.*, 116 F.2d 926, 928 (2d Cir.1941).

{¶ 10} Pursuant to Crim.R. 33(B), a motion for new trial based on newly discovered evidence must be filed within 120 days after the jury verdict or the decision of the court where the jury trial has been waived. A party that fails to file a motion within the 120-day period must seek leave from the trial court to file a delayed motion for a new trial. *State v. Butts*, 10th Dist. No. 22AP-763, 2023-Ohio-2670, ¶ 24. Ohio Crim.R. 33(B) "excuses a defendant's failure to move for a new trial within the * * * 120-day deadline * * * if the defendant proves by clear and convincing evidence that he or she was unavoidably prevented from discovering the evidence on which the motion would be based within that time." *State v. McNeal*, 169 Ohio St.3d 47, 2022-Ohio-2703, ¶ 16. "The standard of 'clear and convincing evidence' is defined as ' "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." ' " *Butts* at ¶ 25, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 11} A defendant " 'is unavoidably prevented from discovering new evidence if "he had no knowledge of the existence of the new evidence and, in the exercise of reasonable diligence, could not have learned of its existence within the time prescribed for filing a motion for new trial." ' " *Hill* at ¶ 19, quoting *State v. Dodson*, 10th Dist. No. 22AP-388, 2023-Ohio-701, ¶ 16, quoting *State v. Lundy*, 10th Dist. No. 19AP-505, 2020-Ohio-1585, ¶ 11. As the defendant has an obligation to exercise reasonable diligence, he cannot claim the evidence was undiscoverable simply because no one tried to obtain the evidence sooner. *State v. Smith*, 10th Dist. No. 23AP-146, 2023-Ohio-4800, ¶ 42, citing *State v. Cashin*, 10th Dist. No. 17AP-338, 2017-Ohio-9289, ¶ 16; *State v. Graggs*, 10th Dist. No. 16AP-611, 2017-Ohio-4454, ¶ 15; *State v. Anderson*, 10th Dist. No. Ohio133, 2012-Ohio-4733, ¶ 14. "In other words, a defendant cannot demonstrate that he was unavoidably prevented from discovering new evidence when he could have discovered that evidence earlier had he exercised reasonable diligence and effort." *Cashin* at ¶ 16, citing *State v. Lenoir*, 2d Dist. No. 26846, 2016-Ohio-4981, ¶ 24.

{¶ 12} To determine a defendant's diligence, the defendant must describe all investigative efforts undertaken during the 120-day period for timely filing a Crim.R. 33(A)(6) motion and explain why he was unavoidably prevented from discovering the

evidence prior to the 120-day deadline. *State v. C.W.*, 10th Dist. No. 22AP-598, 2023-Ohio-4393, ¶ 19, citing *Cashin* at ¶ 17, citing *State v. Whiteside*, 10th Dist. No. 15AP-55, 2015-Ohio-3490, ¶ 19. Conclusory allegations of due diligence are insufficient to demonstrate that the defendant was unavoidably precluded from discovering the evidence he seeks to introduce as support for a new trial. *C.W.* at ¶ 19, citing *Cashin* at ¶ 17, citing *State v. Noor*, 10th Dist. No. 16AP-340, 2016-Ohio-7756, ¶ 17. A defendant can satisfy the Crim.R. 33(B)'s "unavoidably prevented" requirement by demonstrating that the prosecution suppressed the evidence on which the defendant would rely in seeking a new trial. *Hill* at ¶ 19, citing *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, ¶ 25, 57.

{¶ 13} If leave to file a motion for a new trial is granted, in order to succeed on the merits, the defendant must demonstrate that the newly discovered evidence " '(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.' " *State v. T.S.*, 10th Dist. No. 20AP-159, 2021-Ohio-2203, ¶ 34, quoting *State v. Petro*, 148 Ohio St. 505 (1947), paragraph one of the syllabus.

{¶ 14} We review a trial court's decision to deny a motion for leave to file a motion for a new trial under an abuse of discretion analysis. *Hill* at ¶ 15, citing *McNeal* at ¶ 13. Abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *See, e.g., State v. Brown*, 10th Dist. No. 22AP-38, 2022-Ohio-4073, ¶ 19, citing *State v. Angel*, 10th Dist. No. 19AP-771, 2021-Ohio-4322, ¶ 68, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Under this "deferential" standard of review, reversal of the trial court's judgment is not warranted "simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. A trial court commits an abuse of discretion when a legal rule entrusts a decision to a judge's discretion, and the judge's exercise of that discretion is outside the legally allowable range of outcomes. *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19.

## IV. LEGAL ANALYSIS

### A. Appellant's Sole Assignment of Error

{¶ 15} In appellant's sole assignment of error, he argues that the trial court erred by denying his motion for leave to file a motion for a new trial, pursuant to Crim.R. 33(A)(6), based on newly discovered evidence. Specifically, appellant argues that he only recently discovered that his cousin, D.P., could have testified as a witness, but his attorney misled him by stating that the testimony could not be used at trial. (Appellant's Brief at 3.) Appellant argues "[c]ounsel's erroneous ascertainment that [D.P.] could not help the defense prevented movant from understanding within 120 day time fram[e] of Crim.R. 33(A) whether [D.P.] had relevant testimony or if it was [hearsay]." (Appellant's Brief at 2.)

{¶ 16} Upon review, the record is replete with evidence that appellant was not only aware of his cousin's potential testimony, but appellant repeatedly broached the subject of having his cousin testify as a witness throughout the case. On June 4, 2013, the trial court held a pre-trial hearing in this matter. During the hearing, appellant stated that he wanted his cousin to testify at trial. "Basically there's just me and her as witnesses. I told him that I wanted my cousin." (June 4, 2013 Tr. Vol. I at 13.) During the trial, appellant brought up his cousin's testimony on multiple occasions. (July 22 and 23, 2013 Tr. Vol. II at 54-69, 112-16) and (July 24, 2013 Tr. Vol. III at 236-37, 245-50, 267-70). Of note, at the start of trial, appellant raised the matter of his cousin testifying as a witness, but his attorney had concerns that the testimony would be precluded by hearsay. Appellant stated, "I was under the impression that the witness was going to be at trial. But as we spoke, he told me that that witness can't be used because it would bring up hearsay into the picture if he's called as a witness." (July 22 and 23, 2013 Tr. Vol. II at 54.) After F.C. testified, appellant, again stated his desire to have D.P. testify as a witness:

> I want to bring something to [the trial court's] attention * * * Now she's [the victim] just testified to the fact that I was striking her during the time that she was on the phone with [my cousin]. Now, that's why I need [my cousin] as a witness. I do not have him, and I'm going back to the same thing. She's naming him, and I feel that it's against me not to be able to have this witness * * * He can testify to what he may or may not have heard, * * *. I think that's pertinent because it did not happen. It did not occur. There's no way for me to rebut that except for me to say that I didn't, but he can at least testify to maybe he didn't hear it, maybe he did, * * *. I think I should be allowed to have him as a witness.

(July 22 and 23, 2013 Tr. Vol. II at 112-13.)

{¶ 17} Moreover, appellant had multiple telephone conversations with D.P. throughout the life of the case. During the trial, appellant stated that he had spoken with his cousin and was informed that appellant's attorney had not been in contact with D.P. at that point. (July 22 and 23, 2013 Tr. Vol. II at 62.) Appellant went on to inform the trial court that the last time he had spoken with his cousin was two weeks before trial. (July 22 and 23, 2013 Tr. Vol. II at 66.) Appellant also informed the court that he had spoken with his cousin on June 24, 2013, and he asked him to appear at trial. (July 22 and 23, 2013 Tr. Vol. II at 116) ("on the 24th, I called to let my cousin know to be here because he wasn't subpoenaed by my counsel.").

{¶ 18} To be clear, neither the trial court nor appellant's attorney barred D.P. from providing testimony in the case. It appears that D.P. was out of the state as part of his employment as a truck driver. This was addressed during the trial when counsel for appellant called the cousin about appearing as a witness. According to appellant's attorney, he spoke with D.P., but "he is not available. [D.P.] indicated he was on his way to Kentucky. From there, he would drop off a load, pick up a load, and then go to Brooklyn. I asked if there's any way humanly possible that he could be in Columbus, and he indicated he could not." (July 24, 2013 Tr. Vol. III at 247.) Not only is the record filled with examples of appellant discussing D.P. as a potential witness, but appellant's brief repeatedly acknowledged that he informed his attorney and the court that he wanted his cousin to testify at trial. *See* Appellant's Brief at 2 ("The day of trial defendant expressed to his lawyer and the court that it was his understanding he would have [D.P.] as a witness."); s*ee also* Appellant's Brief at 2 ("It was his understanding he would have [D.P.] as a witness. Counsel stated to the court he was not going to be using [D.P.] as he [believed] his testimony to be [hearsay].")

{¶ 19} As set forth previously, a defendant is not unavoidably prevented from the discovery of exculpatory witness testimony when he knew, or should have known, about a witness before trial. In fact, appellant was very aware of his cousin's potential testimony as he repeatedly advocated to have him as a witness throughout the case. " '[I]f a defendant is aware of the evidence at the time of trial, then it is not newly discovered evidence under Rule 33.' " *State v. Ambartsoumov*, 10th Dist. No. 12AP-878, 2013-Ohio-3011, ¶ 23, quoting *United States v. Sims*, 72 Fed.Appx. 249, 252 (6th Cir.2003). Accordingly, "a post-trial affidavit exonerating the defendant that was provided by a witness who could have

been called at trial, but was not, can never be considered newly discovered evidence under Rule 33." *Id.*, citing *United States v. Turns*, 198 F.3d 584 (6th Cir.2000). Even if appellant was not aware of the full extent of his cousin's testimony, he failed to make reasonable efforts, prior to trial, to discover that information. "[D]efendants and their trial counsel have a duty to make serious effort of their own to discover potential favorable evidence." (Internal quotation and citation omitted.) *Smith* at ¶ 43. Because appellant was obligated to exercise reasonable diligence to identify favorable evidence, he cannot now claim that his cousin's testimony was undiscoverable because he did not make reasonable efforts to identify the information prior to trial. Furthermore, we would also note that appellant's motion failed to describe all investigative efforts undertaken during the 120-day period for timely filing a Crim.R. 33 motion and explain why he was unavoidably prevented from discovering evidence prior to the 120-day deadline. *C.W.* at ¶ 19, citing *Cashin* at ¶ 17, citing *Whiteside* at ¶ 19. Appellant's conclusory claims of due diligence are insufficient to establish that he was unavoidably prevented from discovering the evidence of his cousin's testimony. *C.W.* at ¶ 19. Accordingly, the trial court did not abuse its discretion finding that appellant failed to demonstrate that he was unavoidably prevented from discovering his cousin's statement prior to the expiration of the 120-day period provided in Crim.R. 33.

{¶ 20} Finally, appellant states the trial court exceeded its jurisdiction by examining the merits of the filing. Appellant claims the only issue is whether he was unavoidably prevented from discovery of the evidence in the specified time of Crim.R. 33(A). (Appellant's Brief at 5.) However, based on our determination that the trial court did not abuse its discretion by denying appellant's motion for leave, we decline to address the trial court's resolution, or authority to resolve, the substance of appellant's motion for a new trial.

{¶ 21} Accordingly, we overrule appellant's sole assignment of error.

## V. CONCLUSION

{¶ 22} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and LELAND, JJ., concur.

_____